718 So.2d 559 (1998)
STATE of Louisiana
v.
Kiana CALLOWAY.
No. 97-KA-796.
Court of Appeal of Louisiana, Fifth Circuit.
August 25, 1998.
*561 Christopher A. Aberle, Louisiana Appellate Project, Mandeville, for Appellant.
Paul D. Connick, District Attorney, Terry M. Boudreaux, Assistant District Attorney, Gretna, for Appellee.
Before DUFRESNE, WICKER and CANNELLA, JJ.
CANNELLA, Judge.
Defendant, Kiana Calloway, appeals from his convictions on two counts of first degree murder and concurrent sentences to two life terms of imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. For the reasons which follow, we reverse and set aside the convictions and sentences and remand.

FACTS
In the late night hours of July 6, 1994, Vernon Michel (Michel) and Danielle Nigro (Nigro) were shot and killed in their Sandy Lane apartment in the Woodmere Subdivision in Harvey, Louisiana. Nigro was pregnant at the time of the killing. Priscilla Perez (Perez), Thomas Eure (Eure), Margo Perrin (Perrin) and Elizabeth Lawrence (Lawrence) were also at the apartment at the time of the shooting.
According to the trial testimony, the group spent much of the evening playing cards at the kitchen table. Between 9:00 p.m. and 10:00 p.m. that Saturday evening, they ordered a pizza from Godfather's Pizza, where Priscilla Perez had just finished her first day of employment. Michel picked up the pizza. Between midnight and 1:00 a.m., Eure, Perrin, Nigro, and Perez were playing cards. Lawrence was sitting on a sofa watching television. Michel was getting ready to leave for work.
Eure testified to the events that immediately preceded the shooting. He stated that he went outside to get some money from Nigro's purse, which was in her car, parked in front of the apartment, to get money to help pay for the pizza. He stated that as he went to the car, he noticed a large new blue car, perhaps a Crown Victoria, pull up nearby. He said that he retrieved a $20 bill from Nigro's purse, which was on the floor of the passenger side of the car and, after replacing the purse, as he was locking the driver's side door, he noticed a black male coming towards him from the other side of the car. Eure testified that the man told him "don't move," then came around the car, and ordered Eure not to look at him. The man took the $20 bill from Eure's hand and then grabbed Eure's arm directing him back towards the apartment. As they neared Eure's apartment door, Michel coincidentally opened the apartment door. Upon seeing the armed man, Michel retreated into the apartment and attempted to shut the door. The man fired shots at the door, one of which went through the door and another shot grazed the door. Eure ran away through a nearby vacant lot.
Other witnesses testified that the perpetrator then entered the apartment and fired three more shots. One shot struck Nigro and the other two shots struck Michel. The perpetrator then fled the scene. Both victims died from their gunshot wounds. From the shell casings on the ground inside and outside of the apartment, and from the projectiles taken from the victims' bodies, the police determined that the gunman used a 9 millimeter semi-automatic pistol.
The police arrived on the scene fairly quickly. They took statements from the witnesses. Eure and Perez helped the police to develop a composite sketch of the gunman. Defendant was arrested for these murders after Eure and Lawrence picked him out of a six-man physical line-up.
Defendant was charged by grand jury indictment with two counts of first degree murder in violation of La. R.S. 14:30.[1] Subsequently, defendant proceeded to trial before a twelve person jury. At trial, defendant *562 presented alibi evidence through the testimony of his mother, his brother and himself that he was at home at the time of the murders. Following trial, the jury found defendant guilty as charged on both counts.
The jury was unable to reach a unanimous decision in the penalty phase, so the trial judge sentenced defendant to serve two concurrent sentences of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. It is from these convictions and sentences that defendant now appeals.
On appeal defendant assigns seven errors. We find merit in defendant's first and third assignments of error, necessitating reversal of the convictions and sentences. Therefore, with the exception of assignment of error number two, we pretermit consideration of the remaining assignments of error as moot. We considered assignment of error number two because it is relevant to the re-trial of defendant. We find no error in that assignment.

ASSIGNMENT OF ERROR NUMBER ONE
In the first assigned error, defendant argues that the state and the trial court improperly refused to provide the defense with various witnesses' statements containing exculpatory evidence and impeachment material, as required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.
In September of 1994, the defense requested discovery of all exculpatory material, any descriptions of the murderer by eyewitnesses and any other relevant statements by those witnesses. In May of 1995 and May of 1996, defendant filed motions requesting that the trial judge review, in camera, statements by certain prospective witnesses for exculpatory and impeachment material. After a hearing, the trial court granted the defense's motion and reviewed the statements in camera. Judge Jerome Winsberg, the trial judge at that time, noted that there were a few "minor" differences in the statements, but that some of the statements did not say anything concerning identification of the perpetrator.
After the trial testimony of the witnesses, the defense again made a motion, in accord with Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), to have the court review the statements for exculpatory and impeachment material. The judge who presided over the trial, Judge Alfred Monsour, reviewed the statements and ruled that the defense was not entitled to the statements because there was nothing in the statements that contradicted the trial testimony of the witnesses.
Defendant now contends that both the state and the trial court improperly determined that Eure's and Perez's undisclosed statements did not contain exculpatory and/or impeachment material. He specifically alleges that information in the statements was favorable to the defendant and that the witnesses' trial testimony was inconsistent with their earlier statements. Thus, the statements were Brady material which should have been turned over to the defense by the state and/or ordered to be turned over by the court.
The state argues, to the contrary, that the suppressed statements did not contain Brady material and that any inconsistencies in the trial testimony and the statements were minor and did not reach the level of materiality necessary under Brady and its progeny.
In Brady v. Maryland, supra, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See State v. Knapper, 579 So.2d 956 (La.1991). The failure to reveal such evidence adversely effects the defendant's right to a fair trial. U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Favorable evidence has been held to include both exculpatory and impeachment evidence. U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. *563 A "reasonable probability" is less than a preponderance and has been interpreted to be a probability sufficient to undermine confidence in the outcome of the trial. U.S. v. Bagley, supra. The defense does not have to show the evidence would have resulted in a different verdict. Rather, the defendant need only show that disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). See also State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218.
We have reviewed the statements in question in light of the factual circumstances of this case and find that the information therein does reach the level of materiality that would undermine confidence in the outcome of the trial.
Within hours of the murder four witnesses, Eure, Perez, Perrin and Lawrence each gave statements to the police. The state provided the defense with the statements of Lawrence and Perrin only. However, the state never gave the defense, despite several requests, the statements of Perez and Eure. It is the nondisclosure of the statements of these two witnesses that the defense contends constitutes a Brady violation.
The undisclosed statement by Eure was taken a 2:45 a.m., within two hours of the crime. In that statement, Eure described the perpetrator, who stood next to him, grabbed his arm and directed him back toward the apartments, as being "about 6'3"", weighing approximately between 190 and 200 pounds and being between 20 to 25 years old. He further stated that the perpetrator wore a black T-shirt with writing on it. At trial Eure positively identified the defendant as the perpetrator. He further stated that the perpetrator was wearing a dark shirt with long sleeves.
The first undisclosed statement by Perez was given about 30 minutes after the crime. She stated that the perpetrator wore a light blue, button down, collared shirt. Her second undisclosed statement was given about 2 hours later. Therein she stated that the perpetrator was "at least 6' tall." She also stated that she thought that he had a medium build, although she stated that she could not really tell because his clothes were baggy. She described the gun as black and stated that "it had that big round thing by the trigger, you know what I'm, where you put the bullets in and it turns and it spins." At trial Perez testified that the perpetrator was wearing a blue long sleeve shirt. She also stated that the weapon used was a "9 mm automatic."
Because the defense was not provided with these statements by these witnesses, they were not able to expose the discrepancies and inaccuracies in the testimony or the weakness in the identifications. In fact, at the time of the commission of the crime, defendant was 16 years old, between 5'10" and 5'11" and weighed between 150 and 160 pounds. That is a 4 to 5 inch height difference, a 40 to 50 pound weight difference and a 4 to 9 year age difference. The black Tshirt described in the statement was a dark shirt with long sleeves at trial. Further, in Perez's undisclosed statement she appeared to lack any knowledge of guns in describing the weapon as having "the big round thing by the trigger ... where you put the bullets in and it turns and it spins." Yet, at trial, she described the weapon as a "9 mm automatic." Also, the light blue buttoned down shirt was merely a blue long sleeve shirt at trial. Because the defense was not provided these statements, not only was it deprived of the opportunity to cross examine the witnesses about these inconsistencies, but they were also deprived of the opportunity to show the weakness in the identifications. Further, it might have bolstered the defense theory that the witnesses colluded to cover up what really happened on the night in question.
The lack of these statements by defendant is made all the more relevant since there was little evidence against defendant other than the identifications by two witnesses of the defendant as the perpetrator. Further, the defense presented an alibi defense in conjunction with inconsistencies in the state's witnesses' testimony implying that the witnesses were conspiring to hide what really happened on the night of the shooting. For example, there was testimony presented by *564 an employee at the pizza restaurant implying that the pizza was given to Michel at no charge because Perez was an employee there. Yet Eure and other witnesses testified that Eure went out to the car at 1:00 a.m. to get money out of Nigro's purse, which was on the floor of the passenger side of the car, where Eure left it, to repay Michel for half of the cost of the pizza. Also, Perrin and Lawrence gave statements to the effect that Eure was sitting at the table playing cards when the shooting started. Eure had stated that he was outside when confronted by the perpetrator at the car. However, at trial, these witnesses testified that Eure had not come back inside before the shooting. Perez and Lawrence even went further and stated that they were starting to get concerned about his lengthy absence. Deputy Ragas testified that at the scene Eure told him that the perpetrator made him go back to the apartment and open the door. However, at trial, Eure testified that the perpetrator was taking him on the side of the building to rob him or kill him when Michel opened the door to the apartment just at the moment they were passing it.
After considering all of the above, we find that the ability to present a defense was seriously undermined by the state's refusal to turn over the statements of Eure and Perez to the defense and further, by the trial court rulings, both pre-trial and during trial, that the statements did not have to be provided to the defense. We find that defendant was entitled to have the jury consider that the state's "best witness," Eure, who made the critical identification of defendant as the perpetrator of the crime, had originally described a suspect who was older, taller and larger than defendant. The defense was further entitled to present to the jury the numerous inconsistencies raised by the statements of both witnesses. The evidence was material directly to guilt or innocence and to credibility or impeachment of the witnesses. The failure to provide this information to the defense seriously undermines the confidence in the verdict.
Accordingly, we find that the state and the trial court committed reversible error in not turning over the statements of these two witnesses to defendant.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assigned error, defendant argues that the trial court improperly denied his motion to suppress the identifications because the physical line-up was impermissibly suggestive and resulted in a substantial likelihood of misidentification.
At the suppression hearing on February 23, 1995, Detective Grey Thurman testified that on July 18, 1994, he showed a photographic line-up to Perez. This thirty-two photographic array contained a photograph of defendant at age fourteen. Defendant was sixteen at the time of the crime. Detective Thurman showed the same photographic line-up to Eure on July 20, 1994. Detective Thurman testified that neither Perez nor Eure identified anyone from this photographic line-up.
On July 21, 1994, Detective Thurman showed Eure and Perez a second photographic line-up. It contained eight Polaroid photographs of young, African-American men, including a more recent photograph of defendant. Neither Perez nor Eure identified anyone out of this line-up. Lawrence was not shown either of the photographic arrays.
Detective Thurman testified that on July 28, 1994, Lawrence, Perez, and Eure viewed a physical line-up at the Jefferson Parish Correctional Center. This line-up consisted of six African American men, including defendant. Detective Thurman testified that Ann Kelly, an attorney from the Indigent Defender Board, was present on behalf of defendant to ensure the fairness of the lineup. Detective Thurman testified that after viewing the line-up, Lawrence and Eure identified defendant as the gunman. Perez identified someone other than defendant as the gunman.
After considering the testimony at the suppression hearing, the trial judge denied defendant's motion to suppress the identifications. Defendant now challenges this denial.
*565 A defendant challenging an identification procedure must prove that the identification was suggestive and that there was a substantial likelihood of misidentification. State v. Lowenfield, 495 So.2d 1245 (La. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). Even if the identification procedure is found to be suggestive, this alone does not violate due process, for it is the likelihood of misidentification that violates due process, not the mere existence of suggestiveness. State v. Every, 96-185 (La.App. 5th Cir.7/30/96), 678 So.2d 952.
Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The factors to be considered in assessing reliability were initially set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and approved in Manson v. Brathwaite, supra. They include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation.
Any corrupting effect of a suggestive identification procedure is to be weighed against these factors. Manson v. Brathwaite, supra; State v. Martin, 595 So.2d 592 (La.1992); State v. Winfrey, 97-427 (La.App. 5th Cir. 10/28/97), 703 So.2d 63. Finally, in evaluating a challenge to an identification procedure, courts must consider the totality of the circumstances to determine whether an identification presents a substantial likelihood of misidentification. Manson v. Brathwaite, supra.
We must determine whether defendant proved that the identification was suggestive and that there was a substantial likelihood of misidentification.[2]
Defendant contends that the identification by Eure was suggestive because Eure had previously seen defendant in two photographic line-ups. Defendant also argues that Eure's identification was suggestive because defendant's photograph was assigned a number "3" in the Polaroid array and because he was also assigned to the third position in the physical line-up.
We do not find that the identification procedures which led to Eure's identification of defendant were suggestive. Eure did not identify defendant or anyone else in either of the photographic line-ups that he was shown. Moreover, defendant's speculative argument that Eure must have chosen him out of the physical line-up because he remembered him as number three from the photographic lineup, is unsupported by the record. The testimony indicated that Kelly was satisfied that the line-up was fair and impartial, and that she actually chose the position in which defendant was placed at the physical line-up. Importantly, Eure testified at the suppression hearing that no one forced or coerced him to make an identification from the physical line-up. Finally, Eure identified defendant at the suppression hearing. In light of these considerations, we do not find that the identification procedure with regard to Eure was suggestive.
Defendant next contends that procedures which lead to Lawrence's identification were suggestive because, after Eure had identified defendant, he returned to the same room where Lawrence was waiting to view the line-up. Defendant implies that Eure must have told Lawrence to identify defendant and thus, Lawrence's identification of defendant was suggestive. These allegations are not supported by the record.
Detective Thurman testified at the suppression hearing that after Eure had identified defendant as the gunman, he told Eure not to talk about the line-up or to *566 discuss with the others whom he had identified. Then, Eure was brought back to the room where Lawrence and Perez were still waiting. Perez was taken to the identification room next, leaving Eure and Lawrence alone.
However, in contrast to his suppression testimony, Detective Thurman, at trial, denied leaving Eure in the room with Lawrence prior to her viewing the line-up. Also, on cross-examination, he explained that he was not sure that Eure went back into the room with Lawrence, and that he thought that Eure had possibly gone outside to smoke.
At the suppression hearing, Eure testified that after the identification, he did not go back into that room with Perez and Lawrence, but he went outside to smoke. At trial, Eure testified that he was "positive" that he did not go back into the room where Lawrence was waiting.
At trial, Lawrence also testified that they were all placed into one room when they first arrived. However, she stated, "we went in one by one, and we never seen (sic) each other or spoke to each other again until after it was over with." Moreover, Lawrence testified that no one forced or threatened her to identify anyone out of the line-up. She further testified that she was not led to believe that she had to pick anybody out of the lineup. Like Eure, she, too, identified defendant. Finally, while Perez did not testify at the suppression hearing, she testified at trial that Eure did not return to the room where she and Lawrence were sitting. She stated that he was outside of that room and that she passed him on her way to view the line-up.
Based on the evidence reviewed, we do not find that Lawrence's identification of defendant was suggestive or that Eure tainted her identification.
Having determined that defendant failed to make the initial showing of suggestiveness, we find it unnecessary to fully address whether there was a substantial likelihood of misidentification. However, after reviewing the record, including the previously undisclosed statements, in light of the factors set forth in Manson, we also find that there was not a substantial likelihood of misidentification. While it is true that Eure's initial description of the defendant's height, weight and age were somewhat off the mark, Eure also got a long view of the perpetrator's face and assisted the sheriff's office in making up a composite sketch that lead to defendant. Lawrence's initial description of the perpetrator was very close to defendant's age, height and weight.
Accordingly, we find that the trial judge did not err in denying defendant's motion to suppress the identifications.

ASSIGNMENT OF ERROR NUMBER THREE
By this assignment of error, defendant contends that the trial judge improperly refused to allow him to present the testimony of several witnesses, thereby hampering his right to present a defense. More specifically, defendant complains that the trial court's ruling unconstitutionally deprived him of the testimony of Torey Brown, Kisha Brown, Madeline Brown and Dewaneta Ellis (Ellis), all of whom would have corroborate his alibi defense. Also, Glenn Guidry (Guidry) would have testified that he was originally questioned by the police as a suspect. Further, Kelly, the attorney for defendant at the lineup, and Walter Amstutz, Detective Thurman's supervisor, would have testified regarding proper line-up procedures.
The record reflects that the state spent approximately 30 hours to present its case in the guilt phase of this trial, over the course of three days, beginning on July 25, 1996 and ending on July 27, 1996. On July 27, 1996, after 4:00 p.m., defendant began the presentation of his case and called six witnesses to testify. After the testimony of his sixth witness, at 8:30 p.m., defense counsel intended to call defendant's sister, who had been at court for the past twelve hours, but who had to leave to pick up her child from the sitter. The other witnesses that defendant planned to call were also not present, but, counsel informed the trial judge that they could be available in the morning.
The state argued that this was unnecessary delay, pointing out that they had notified defense counsel that they would finish their case that day. Defense counsel *567 countered that the state had noticed the defense that they would be finish the night before or that morning. The defense had its witnesses available that morning. In fact, the state did not rest its case until after 4:00 p.m. After much discussion, the trial judge gave defendant approximately fifteen minutes to get his witnesses to the courthouse to testify. Again defense counsel noted that he did not have the state staff to round up his witnesses and that he had been in court the night before until after 11:00 p.m. After further discussion, the defense was given the choice of putting the defendant on the stand at that time, or waiving its right to call him as a witness. Given that harsh choice, defense counsel struck a compromise that, if the trial court recessed for the night, the defense would only call defendant the following day.
The following morning, before the jury was called in, defense counsel announced that he had several witnesses available and ready to testify and requested permission from the trial judge to call them to the stand. Based on the ruling the previous night, the trial judge denied the request to have the witnesses testify. Defense counsel subsequently proffered the testimony of these witnesses.
We must now determine whether the trial court's refusal to allow defendant to call these witnesses hampered his constitutional right to present a defense.
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to present a defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Hamilton, 441 So.2d 1192 (La.1983). In State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680, the Louisiana Supreme Court stated that a defendant is deprived of his defense and a fair trial where the court erroneously excludes witness testimony that would have substantially helped the defense.
All relevant evidence necessary to that defense must be presented for a full adjudication. State v. Vigee, 518 So.2d 501 (La.1988). However, this right does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Carter, 96-358 (La.App. 5th Cir. 11/26/96), 685 So.2d 346. Moreover, a court is not required to allow the defense to introduce evidence, which although relevant, has little probative value and might confuse the jury or cause unnecessary delay. La. C.E. art. 403; State v. Mosby, 595 So.2d 1135 (La. 1992).
At trial, the defense attempted to present an alibi theory to show that someone other than defendant committed the murders because defendant was at home at the time of the crimes. Defendant's mother, Molly Diggs (Diggs), testified that on the night of the murders, she arrived home at around 10:30 p.m. or 10:45 p.m. She stated that she had been at a church conference that night, and that she remembered coming home and seeing defendant and her oldest son, Sean Galmore (Galmore), and two of their friends, Kurt and Torey, in her driveway. She testified that they were playing loud music and she told them to turn it down. Diggs further testified that she went inside and defendant and his friend Torey came in the house later. Diggs further testified that defendant telephoned his girlfriend and was on the phone with her for a long time, because she woke up and discovered that he was still on the phone. Lastly, she testified that defendant was walking around talking on the phone and "raiding the refrigerator."
Similarly, defendant's brother, Galmore, testified that he remembered being in the driveway with his brother and some friends on the night of the incident. He said that they were playing music in the driveway and "rapping." He testified that after they went inside that night, they did not go back outside. Defendant's brother also testified that he did not go to sleep until early that morning because his friend Torey left at about 2:00 a.m., and at that time, defendant was on the phone with his girlfriend, Ellis. On cross examination, when the state asked Galmore if he had ever told anybody until trial that he had an alibi for his brother, he answered negatively.
*568 At trial, defendant testified that on the night of the murders, he was at home. He stated that he and some friends were in the driveway playing loud music. He testified that at around 9:30 or 10:00 p.m. on the night of the shooting, his mother came home from a church meeting and told him to turn the music down. He said that they stayed outside for a while and then he, his brother and their two friends went in the house at around 11:30 or 12:00 a.m. Defendant also stated that after he and his friends went inside, he and Torey played Super Nintendo for a while. He stated that he then started talking on the phone with Ellis at about 1:30 or 2:00 a.m. Last, in an attempt to show that there were other suspects of this crime, defendant identified a "Delwin Brown" as the person in the upper left photograph in state's exhibit twenty-three, which was one of the photographic line-ups shown to Eure and Perez.
According to the defense proffer, another witness, Guidry would have testified that Detective Thurman accused him of being involved in the murder, but offered him a "deal" to testify against defendant. The defense also contended that Madeline Brown was with Diggs that night and would have stated that defendant and Torey Brown were at the Brown house earlier and then left to go to defendant's house.
The proffer also indicated that Kisha Brown would have testified that on the night of the murders, she drove past defendant's house on the way to the store and noticed that he was outside with a group. She would have further testified that she also drove past the Alex Korman and Sandy Lane area, and noticed a crowd of people and police cars in that area. According to the proffer, she would have stated that when she returned, she saw that defendant was still home because she went to "tell them the local crowd that was out there listening to music" that something was happening down the street.
According to the defense proffer of Torey Brown's testimony, Brown would have testified that he was with defendant on the date of the murders all day and all night until 2:00 a.m. when he left to go home. The proffer of the substance of Ellis' testimony indicated that she would have testified that she was talking on the telephone with the defendant when her brother came in and told her that something had happened down the street and that the police were there.
In State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680, one of the most recent cases from the Louisiana Supreme Court on the right to present a defense, the court stated at page 6 that:
The defendant is deprived of his defense and a fair trial where the court erroneously excludes defense witness testimony that would have substantially helped the defense. State v. Shoemaker, 500 So.2d 385, 389 (La.1987). Where the excluded testimony is crucial to the defense theory, a conclusion of reversible error would be well founded. State v. Caldwell, 504 So.2d 853, 856 (La.1987); State v. Rankin, 465 So.2d 679, 683 (La.1985).
In Everidge, defendant was charged with and convicted of rape. His theory of defense at trial was consent. Only the victim and the defendant testified at trial about the alleged rape. The defense sought to offer the testimony of Ernest Domino, a witness who, hours before the rape, overheard the victim and the defendant arrange a sexual rendezvous and observed them hug and kiss. The Everidge court found it significant that the only witnesses to testify at trial were the victim and the defendant. The court also found that Domino's testimony "offered the only evidence which could have corroborated" the defendant's version and refuted the victim's version. Id. at p.6. Thus, the Everidge court found that the excluded evidence was crucial to the defense theory and prevented defendant from asserting his defense. The Supreme Court reversed defendant's conviction because he did not receive a fair trial.
Likewise, in this case, we find that the excluded evidence was essential to the defense theory that the defendant was not the perpetrator of the crime. The only evidence in the case against the defendant was identification testimony by two witnesses. Defendant maintained that he was home during the time of the crime. Several witnesses *569 who did testify supported that contention, but did not complete a time line that would have excluded the possibility that defendant could have committed the crime. However, the excluded testimony of Ellis, proffered to the effect that she was on the phone with the defendant at the time of the crime, and Torey Brown, that he was with the defendant the entire evening, was evidence essential to defendant's case.
Furthermore, we find no compelling reason for denying defendant the right to call these witnesses. It was 8:30 at night, after a full day of trial, and the jury had not yet been provided dinner. Some of the witnesses that had been at the courthouse all day, had left. The trial court insisted that the witnesses be there within 15 minutes or be barred from testifying. Defense counsel noted his lack of staff and resources to get the witnesses there within 15 minutes, but assured the court that they would be present in the morning. The state had spent 30 hours over three days presenting its case. The defense had spent 4 hours. Defendant, in fact, did have his witnesses present in court to testify the following morning. The trial judge, nevertheless, denied the defense the opportunity to call the witnesses to the stand to testify.
Under the circumstances of this case, considering the importance of the testimony, the evidence against the defendant and procedural posture of the case at the time, we find that defendant's constitutional right to present his defense was adversely limited by the trial court ruling preventing him from calling these witnesses to testify.
Accordingly, for the foregoing reasons, the convictions and sentences for first degree murder are set aside and the case is remanded to the district court for a new trial or further proceeding.
CONVICTIONS AND SENTENCES SET ASIDE AND CASE REMANDED.
DUFRESNE, J., dissents.
DUFRESNE, Judge, dissenting.
I respectfully dissent. I reviewed the record and have considered all arguments raised by the defendant on appeal, giving extra scrutiny to the issues addressed in the majority opinion. This review has led me to conclude that any possible errors which occurred during the trial of this matter were harmless and did not deprive the defendant of his right to a fair trial.
Accordingly, I would affirm the defendant's convictions and sentences.
NOTES
[1] In connection with this incident, defendant was also charged with one count of armed robbery, La. R.S. 14:64, and one count of first degree feticide, La. R.S. 14:32.6; however, these two counts were severed by the state and defendant's trial and this appeal only involve the two first degree murder convictions.
[2] In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress but may also consider pertinent evidence given at the trial. State v. Burkhalter, 428 So.2d 449 (La. 1983).