781 So.2d 849 (2001)
STATE of Louisiana
v.
Kiana CALLOWAY.
No. 00-KA-1230.
Court of Appeal of Louisiana, Fifth Circuit.
February 28, 2001.
*850 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Rebecca J. Becker, Donald A. Rowan, Jr., Spiro G. Latsis, Assistant District Attorneys, Gretna, Counsel for plaintiff-appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Counsels for defendant-appellant.
Court composed of Judges SOL GOTHARD, JAMES L. CANNELLA, and H. CHARLES GAUDIN, Pro Tempore.
H. CHARLES GAUDIN, Judge, Pro Tempore.
Kiana Calloway was convicted of two counts of manslaughter by a jury in Jefferson Parish. He was sentenced to 34 years at hard labor on each count, to run concurrently.
On appeal, he contends:
(1) the evidence was insufficient to support the convictions,
(2) the district court erred by allowing written testimonial evidence to be brought into the jury room over defense objections, and
(3) defense counsel rendered ineffective assistance by failing to use extremely critical exculpatory and impeachment information that was readily available from the transcript of the first trial and which was referred to in large part by this Court in its opinion reversing the appellant's first convictions.
We affirm Calloway's convictions, finding no reversible error.

BACKGROUND
This matter is before this Court on a second appeal following a remand in State v. Calloway, 97-796 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, writs denied, 98-2435, 98-2438 (La.1/8/99), 734 So.2d 1229. Calloway originally appealed his convictions and sentences on two counts of first *851 degree murder. The indictment also charged him with one count of armed robbery and one count of first degree feticide, but these two counts were severed and his trial in the first appeal involved only the two first degree murder charges.
This Court found, in the first trial, that Calloway's constitutional right to present his defense was adversely limited by the trial court's preventing him from calling certain witnesses to testify and by its refusal to order the state to turn over the statements of Thomas Eure and Priscilla Perez. The convictions for first degree murder were set aside and the case remanded for a new trial.
A new trial was scheduled. Then, on October 5, 1999, prior to jury selection, the state amended the indictment from two counts of first degree murder of the victims, Vernon Michel and Danielle Nigro, to two counts of second degree murder, LSA-R.S. 14:30.l. Counts 3 and 4, the charges for armed robbery and first degree feticide, were severed.
This trial ended in a mistrial after seven potential jurors inadvertently viewed a box that contained Calloway's name and four charges.
A third trial began on November 9, 1999, resulting in Calloway being found guilty of two counts of manslaughter, the lesser verdicts. This appeal followed.

ASSIGNMENT NO. 1
Here, Calloway argues that evidence supporting the manslaughter convictions was not sufficient.
On July 16, 1994, during the early morning hours, Michel and Nigro were shot and killed at 3729 Sandy Lane, located in the Woodmere Subdivision in Harvey, Louisiana. Before the shooting, Perez, Margo Perrin, Eure and Elizabeth Lawrence played cards with the victims and ate pizza.
The cause of death for both victims was a fatal gunshot wound inflicted by a 9mm semiautomatic gun.
Two witnesses, Eure and Lawrence, were positive Calloway shot the victims. Eure testified Calloway first robbed him of $20 when he (Eure) went outside to get money from Nigro's purse in order to pay half the cost of the pizza.
According to Eure, Michel was going to work and needed money. Michel asked to be reimbursed since he paid the entire cost when the pizza arrived. Eure went to a car about 1:00 a.m. and reached in to retrieve a $20 bill from Nigro's purse. He was approached by a gunman, identified by him as Calloway, who pointed a black automatic gun at him and said, "Don't move." Calloway grabbed Eure's left arm and took Eure to the side of the building saying, "Don't look at me." When the two men were two feet beyond the door of the apartment, Michel stepped out. Calloway then pointed the gun at Michel and said, "Don't move, don't move." Next, Calloway released Eure and shot twice in the direction of the door. Eure ran into a field and subsequently went to another apartment to call 911. Approximately 30 seconds elapsed between the time he left the apartment to get the money and the time Michel was shot. When he saw the police arrive, Eure re-entered the apartment and found Michel and Nigro on the floor. The other two women were locked in the bathroom.
Lawrence testified the group ordered pizza and Michel left to pick it up. She was shown a diagram of the homicide scene, and was asked to write the initials of the individuals in the apartment, indicating their location. She stated Michel and Nigro were sharing the cost of the pizza and that when Michel went to get the *852 pizza, he did not have change. Eure left to get money from Nigro's purse that was in Nigro's car. Michel waited for Eure about two to three minutes, but could wait no longer since Michel would be late for work. Michel attempted to leave the apartment by opening the door. She heard a loud noise. The door slammed, or flew open, and Michel walked backwards into the apartment. She identified Calloway as the person who entered. She jumped over a table and went upstairs to hide in a bedroom closet. Approximately two minutes later she heard banging at the door and police radios. She came downstairs and saw that Michel and Nigro were dead. When she came down, Eure, Perrin, Perez and the police were present.
Perrin testified the group ordered pizza. Michel and Eure shared the cost. Michel was preparing to go to work and Eure went to Nigro's car to get Eure's wallet in order to give Michel money. Eure was outside about three minutes. She did not see the shooter. She was sitting at the table when the gunfire erupted and she got on the floor. After the shooting, she hid in the bathroom.
Eure and Perez assisted officers in developing a sketch of the perpetrator. Composite sketches were developed and distributed through the neighborhoods. Sergeant Bruce Chauvet testified that he approached Calloway, asking him if he knew anything about the shooting on Sandy Lane, while Sergeant Chauvet carried one of the fliers containing a sketch of the alleged perpetrator. Calloway did not recognize the photograph, but asked Sergeant Chauvet if the sergeant could tell him whether there was a robbery involving a 9mm weapon. To the best of the officer's recollection, Sergeant Chauvet was "almost sure" these specific details had not been released by the news media at the time he spoke to Calloway. Although the information regarding the 9mm weapon was placed on the police wanted bulletin, this information was not placed on the fliers shown to the general public.
Sergeant Chauvet also saw Calloway in the area of the incident one or two days before the homicides.
Sergeant Grey Thurman testified he developed a photographic lineup that included defendant's photograph taken a few days after the incident. He showed the lineup to Eure and Perez, who could make no identification of the perpetrator. Next, he asked an officer to take a photograph of Calloway to place in the lineup because he thought the other photograph did not accurately depict Calloway. He prepared a second photographic lineup with other Polaroid photographs, but was concerned that Calloway's photograph did not show enough of the facial features. Eure and Perez could not make an identification from the second photographic lineup. The officer did not show Lawrence any photographic lineup because she lived further away than the other two witnesses and the other two witnesses had not made an identification.
Sergeant Thurman next conducted a physical lineup including Calloway. Eure and Lawrence identified Calloway. Perez also viewed this lineup, but identified a different person. Calloway did not testify at trial, but he presented an alibi defense through Madeline Brown's testimony that he was at her home the evening of the shootings.
Calloway challenges the identifications because there were inconsistencies in the descriptions given of the perpetrator as well as inconsistencies in the events related by the witnesses. The state contends that the discrepancies were explained by witnesses and that this Court *853 should not reevaluate the jury's credibility determinations.
At trial, Calloway was clearly identified by witnesses. Defense counsel, through cross-examination, provided the jury with full disclosure of the flaws and inconsistencies in the identification process. Although the circumstances surrounding these identifications are less than ideal, the positive identifications coupled with Calloway's damaging statement regarding the murder weapon sufficiently negate that reasonable probability of misidentification.

ASSIGNMENT NO. 2
During deliberations, the jury asked to see a map of the area and a diagram of the apartment. These documents had been admitted as evidence by the prosecution, without objections, but they had then been written on by Sergeant Chauvet, to indicate on the map where Calloway lived and where the murders took place, and by Elizabeth Lawrence, who initialed the diagram showing where she and everyone else was when the gunman started shooting.
Inasmuch as neither of these documents related to the identifications of Calloway, to his alibi defense or to any other significant issue, any error in allowing jurors to see them is harmless.

ASSIGNMENT NO. 3
Calloway contends that his trial lawyer was ineffective because he failed to adequately investigate, failed to call witnesses and failed to impeach witnesses who did testify.
Evidence of these allegations is not apparent in the record; consequently, Calloway's ineffective counsel claims are reserved for post-conviction relief and an evidentiary hearing, upon pertinent application, in the district court.
Accordingly, the defendant's convictions and sentences are hereby affirmed.
AFFIRMED.