806 So.2d 816 (2001)
STATE of Louisiana
v.
Travis HAYES.
No. 01-KA-736.
Court of Appeal of Louisiana, Fifth Circuit.
December 26, 2001.
*818 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, Counsel for Travis Hayes, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, 24th Judicial District Court, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Alison Wallis, Assistant District Attorneys-Appellate Counsel, Gretna, LA, Counsel for State of Louisiana, Plaintiff-Appellee.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
SUSAN M. CHEHARDY, Judge.
On May 29, 1997, the defendant, Travis Hayes, was indicted by a Jefferson Parish grand jury for the first degree murder of Tommy Vanhoose, a violation of La. R.S. 14:30.[1] On June 5, 1997, the defendant was arraigned, and he entered a plea of not guilty. On November 30, 1998, the State amended the defendant's indictment to second degree murder, in violation of LSA-R.S. 14:30.1.
On December 1, 1998, trial began and, after five days of testimony, the jury, by a vote of 10-2, found the defendant guilty as charged of second degree murder. On January 4, 1999, defendant filed a motion for new trial and a notice of appeal.[2] Defendant's motion for new trial was heard and denied on January 11, 1999. That same day, after waiving delays, defendant was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence.
On appeal, defendant argues that the trial court erred in disallowing testimony from an expert witness on his diminished mental capacity and contends that the State failed to present sufficient evidence to support his second degree murder conviction. We have reviewed his assignments of error and, for the following reasons, we affirm his conviction and sentence.

FACTS
Tommy Vanhoose was the owner and manager of Comeaux's Grocery in Bridge City, Louisiana. On the evening of April 5, 1997, while Vanhoose was working in his office in the back of the store, a man walked in, put a gun to Mr. Vanhoose's head, and demanded money.[3] Mr. Vanhoose refused to give the gunman any money and the gunman became enraged. When the cashier, Sheree Falgout, and another employee, Anthony Garabold, saw a man with a gun in the back of the store, they ran out of the store.[4]
Sheree, who heard gunshots while leaving the store, ran to a nearby house and called 911. Garabold also heard gunshots while running to a nearby bar to get help. At about that time, Edward Falgout, who lived four blocks from Comeaux's, stopped at the store to buy a lottery ticket with his *819 wife, Gloria Falgout. Edward saw people running out of the store as he pulled up, then he saw a person, wearing a ski mask and a checkered, flannel shirt, come out of the store carrying a silver revolver and fire a shot. Gloria Falgout described the man who exited the store and fired a shot as a black male wearing flannel shirt and a ski mask.[5]
Terrance Czop was standing outside of a nearby bar that evening when he heard gunshots and saw Anthony Garabold running towards the bar yelling, "Call 9-1-1." He saw a rust-colored Ford LTD, with one person inside, pull from 11th Street onto Bridge City Avenue at a high rate of speed. Czop went to Comeaux's, found Mr. Vanhoose lying face down in the back office and performed CPR on him.
Brent Cheramie and his cousin, Dale Blanchard, were turning onto 11th Street from Bridge City Avenue when they saw a person, wearing a flannel shirt, gloves, and a ski mask, running from the direction of Comeaux's to a car parked on 11th Street. The person was carrying a nickel-plated gun that he shot at them before he jumped through the passenger window of the waiting car, which they described as a grey Monte Carlo or Grand Prix. Cheramie saw the gunman's face when he took off the ski mask and flannel shirt in the car.
When the grey vehicle sped up behind them on 11th Street, Cheramie would not let it pass. Cheramie saw the perpetrators throw the flannel shirt, ski mask and gloves from the window. When the two vehicles reached the end of the street, Cheramie went left onto River Road and the other vehicle went right. After Cheramie dropped his cousin off at Comeaux's, he tried to catch the vehicle. When he could not, he returned to 11th Street to retrieve the articles thrown from the car. Cheramie returned with a ski mask, flannel shirt and glove.
Deputy Campbell of the Jefferson Parish Sheriff's Office (JPSO) responded to a reported armed robbery and aggravated battery by shooting that evening at Comeaux's Grocery at 1700 Bridge City Avenue. When he entered the store, he found a white male, lying face down on the floor in the rear office. He found a nine-millimeter pistol, which did not appear to have been fired, underneath the victim's body.
Detective Ralph Sacks of the JPSO Homicide Division, the leading investigator for the case, took pictures of some tire tracks on 11th Street which indicated that a vehicle was heading from Bridge City Avenue toward River Road. He could not obtain a good mold because the ground consisted of shells.
On April 5, 1997, Thomas Bryson of the JPSO Street Crimes Division received a radio report of an armed robbery at Comeaux's and a description of the get-away vehicle as a grey primer-type late model Monte Carlo. Around 10:00 p.m. that evening, he noticed two men in a primer-grey Grand Prix, similar in body style to the Monte Carlo. Bryson stopped the vehicle because the occupants were not wearing their seatbelts and the inspection sticker had expired. When he stopped the car, both windows were down. Immediately after stopping the vehicle, Bryson notified the homicide division. The driver of the vehicle identified himself as Travis Hayes, and the passenger identified himself as Damien Johnson.[6]
*820 Lieutenant Maggie Snow, a supervisor in the JPSO Homicide Division, took statements from witnesses, including Cheramie and Blanchard, on the evening of the homicide. Snow also transported Cheramie and Blanchard to identify the stopped vehicle later on the same night. Both Cheramie and Blanchard positively identified the vehicle as the same vehicle they had seen on 11th Street earlier that evening but only Cheramie identified Ryan Matthews as the gunman. Neither Cheramie nor Blanchard could identify the defendant as the driver of the vehicle.
On the evening of Vanhoose's murder, Detective Sacks interviewed Damien Johnson/Ryan Matthews at the Detective Bureau. That same night, Lieutenant Steve Buras, Commander of the Homicide Division for JPSO, interviewed the defendant and took four statements from him over the course of five to six hours.
According to Lt. Buras, in the first statement, the defendant referred to Ryan Matthews as Damien Johnson. The defendant alleged to have only known Ryan Matthews for a couple of days, and that he had just picked Matthews up a half-hour before they were stopped by police on April 5, 1997 at 10:20 p.m.[7]
In the second statement, the defendant said that he had been with Matthews since 9:00 p.m. but maintained that he had only known him for a period of two or three days.[8] In the third statement, the defendant informed him that he had been with Matthews since 3:15 p.m. on April 5, 1997 until they were stopped by police at 10:20 p.m. Also, the defendant placed himself and Matthews together in the Bridge City area in the third statement.[9] In the fourth *821 taped statement, the defendant admitted that he and Matthews were riding around in Bridge City when Matthews got the "munchies" and told defendant to stop at the corner store.[10] At trial, the four taped statements were played to the jury.
On April 6, 1997, Snow executed a search warrant on the defendant's residence. She testified that she seized three magazine clips for a large caliber rifle, two twenty-gauge shotgun shells, one plastic nine-millimeter toy gun, one knit cap, three bandanas, and two sawed-off shotguns.
On April 20, 1997, Jimmy Reamey, who has lived on River Road in Bridge City for more than fifteen years, found a snubbednose.38 pistol in a ditch while weed-eating on his property. He immediately contacted the Jefferson Parish Sheriff's Office who sent an officer to retrieve the gun.
At trial, Dr. Fraser Mackenzie, an expert in forensic pathology, who performed the autopsy on Mr. Vanhoose, testified that the cause of death was multiple gunshot wounds to the body with perforating wounds of the lung, kidney and aorta. Louise Walzer, assistant director at the JPSO Crime Lab and expert in firearms identification testified that the bullets obtained from the victim's body were fired from the .38 caliber pistol found in the ditch on River Road. She stated that the nine-millimeter pistol, found under the victim's body, had not been fired.
Charles Martin, Ryan Matthews' father, testified that his son and the defendant had been friends for several years at the time of the killing. He identified one of the sawed-off shotguns found in the defendant's house as a shotgun given to Martin by his father. Martin testified that he noticed that the gun was missing from his home in March of 1997 and approached his son regarding the gun, who denied knowing its whereabouts. Martin testified that, when he had the gun, neither the barrel nor the stock was sawed-off.
Corey Bethley, the previous owner of the primer-grey 1981 Grand Prix, testified for the defense. Bethley stated that he sold the car to the defendant's sister, Victoria Shepherd, one or two months before the murder. The registration indicated that the car was sold on March 22, 1997.
Bethley stated that he replaced both doors on the car and installed power windows while he owned the car. When he sold the car, however, the passenger window did not work because the motor was burned out. Bethley claimed that, on the day of the murder, the defendant brought the car to his house to pick up the license plate and exchange the tire rims. He and the defendant started changing the tires at 4:00 p.m. and did not finish until it was getting dark.
Paul Cosma testified as an expert in auto mechanics and specifically automobile electronics. He inspected the car in November of 1998. When he inspected the *822 vehicle, the passenger side window did not work because the motor that operated the window was burned out. He also stated that the rear windows were only aesthetic and, therefore, did not go up or down. On cross-examination, he admitted that he had no personal knowledge of the condition of the window on April 5, 1997. He also stated that the car had no air conditioner.
Julie Golden, an expert in DNA analysis and molecular biology, also testified for the defense. She analyzed DNA material from a tissue sample found on the ski mask and the mouth area of the mask. Golden testified that the DNA profiles of the defendant and Ryan Matthews were not the source of the material.

DISCUSSION
In this assignment of error, the defendant claims that the evidence was insufficient to support the verdict of guilty of second degree murder because there was no evidence that he killed Mr. Vanhoose or that he had any foreknowledge of the armed robbery. The State contends that a reasonable trier of fact could infer from the evidence presented that the defendant was on the scene to assist Ryan Matthews in an armed robbery and that a killing occurred during an attempted perpetration of an armed robbery at Comeaux's Grocery.
When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731 (La.1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828.
If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the court's error requires a reversal of the conviction or was harmless. State v. Hensley, 00-1448 (La.App. 5 Cir. 2/28/01), 781 So.2d 834, 838. Pursuant to Hensley, we will address the sufficiency of evidence first, and then, if necessary, address the inadmissibility of a witness's testimony.
The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. State v. Lapell, 00-1056 (La.App. 5 Cir. 12/13/00), 777 So.2d 541, 545.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La.1982). When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in *823 order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438.
A different standard is applied on appellate review. The Louisiana Supreme Court recently commented:
On appeal, the reviewing court `does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.' ... Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
The State argued in this case that the victim was killed during the commission of an armed robbery and that the defendant was a principal to that armed robbery. La. R.S. 14:30.1 A(1) defines second degree murder as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including armed robbery. One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. State v. Dunn, 94-776 (La.App. 5 Cir. 2/15/95), 651 So.2d 1378, 1388-89. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. LSA-R.S. 14:64.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. Only those persons who knowingly participate in planning or executing a crime are principals to that crime. Mere presence at the scene of a crime is not enough to make one a principal. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427; State v. Girod, 94-853 (La.App. 5 Cir. 3/15/95), 653 So.2d 664.
Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Pierre, supra; State v. Cedrington, 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 574. The mental state of one defendant may not be imputed to another defendant. State v. Cedrington, supra, at 573.
In the present case, the evidence shows that the defendant was present at Comeaux's Grocery at the time of the murder. His own statements placed him at Comeaux's between 6:00 p.m. and 6:30 p.m. The defendant admitted that Ryan Matthews, later identified as the shooter, went into Comeaux's and came running out after gunfire. Two witnesses identified the defendant's car as the vehicle waiting on 11th Street as the getaway car, and both witnesses testified that an armed person wearing a ski mask and flannel shirt ran to the waiting vehicle.
In his brief, the defendant argues that his presence outside in a car does not make him a principal. He contends that he did not know that an armed robbery was planned or had occurred until after its *824 completion. He claims that Ryan Matthews left his vehicle with no gun or mask, and that he thought Matthews was running to get away from the gun fire.
While mere presence at the scene of a crime does not make one a principal to the crime, "it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." Cedrington, supra, at 573, 576 (quoting State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225).
The inquiry is, thus, whether the State proved that the defendant was aware of Ryan Matthews's intention to commit armed robbery. Several witnesses testified that there were available parking spaces in front of Comeaux's but that the defendant was waiting in his car on 11th Street, around the corner from Comeaux's. According to witnesses, the shooter, carrying a chrome gun, ran to 11th Street from the direction of Comeaux's and jumped through the passenger window into the defendant's vehicle. The vehicle immediately sped away and tried to pass the witnesses' vehicle on 11th Street before turning onto River Road. Further, the defendant admitted that he was the only person driving the vehicle from 3:00 p.m. until the police stopped them at 10:20 p.m. on April 5, 1997.
In State v. Hill, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147, defendant was convicted of second degree murder of a victim killed by the defendant's accomplice during an armed robbery. Defendant claimed that he lacked specific intent to kill the victim. This Court upheld defendant's second degree murder conviction as a principal to the crime because defendant was at the murder scene with knowledge by his own admission that his co-defendant planned to rob the victim and that defendant nonetheless chose to remain with the co-defendant, defendant did nothing to prevent the crime, and defendant did not come to the victim's aid after the shooting but rather fled the scene
In State v. Meyers, 95-750 (La.App. 5 Cir. 11/26/96), 683 So.2d 1378, writ denied, 97-0234 (La.6/20/97), 695 So.2d 1350, this Court upheld the second degree murder conviction of a passenger who was in a car during a drive-by shooting. Defendant argued he did not have the requisite criminal intent as the actual shooter was another passenger in the car. This Court found that the defendant did nothing to assist the victim after the shooting and did not call the police to report the shooting. While this Court noted that there was no direct evidence that defendant knew the shooter was armed, we also found the jury reasonably inferred that all the occupants of the vehicle knew the purpose of confronting the victim, a drug dealer, on the street that night.
Several of the factors discussed in Hill and Meyers are also present in this case. First, the defendant was at the scene of the murder by his own admission. Second, the defendant was waiting in his car around the corner from the store that he admitted Matthews entered. Third, the defendant had his car ready to drive away and immediately drove away from the scene after Matthews dove into the passenger window. Finally, the defendant did not attempt to call the police to report the shooting. The evidence shows that the jury could have reasonably inferred that the defendant was aware of Ryan Matthews's intention to commit an armed robbery.
A determination of the weight of evidence is a question of fact, resting *825 solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 35. It is not the function of this Court to assess credibility or to re-weigh evidence. State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036. Accordingly, we find no merit in defendant's argument.
In his second assignment of error, defendant contends that he was precluded from presenting an essential part of his defense when the trial court refused to allow the testimony of Dr. Raphael Salcedo. According to the defendant, Dr. Salcedo would have testified that, at the time he made his inculpatory statements, the defendant had a diminished mental capacity that made him more susceptible to saying things suggested to him during the extensive interrogation by the police. The State points out that the trial court denied the pre-trial motion to suppress the statements and responds that the defendant was not entitled to another opportunity to attack the admissibility of the statement by introducing Dr. Salcedo's testimony at trial. The State notes that the defendant failed to introduce Dr. Salcedo's testimony at the suppression hearing.
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to present a defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Hamilton, 441 So.2d 1192 (La.1983). In State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680, the Louisiana Supreme Court stated that a defendant is deprived of his defense and a fair trial where the court erroneously excludes witness testimony that would have substantially helped the defense. State v. Calloway, 97-796 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, 567.
On June 17, 1997, the defendant filed a motion to suppress statements. The matter was heard by the trial court on November 26, 1997. At the hearing, the defendant argued that the four statements made by the defendant should be suppressed because the statements were not voluntary. The defense specifically argued that the defendant was interrogated from 11:00 p.m. until 5:30 a.m., that he was not given food, sleep, drink or bathroom breaks, and that because of his youth there was no voluntary waiver. The trial court denied the defendant's motion to suppress, stating that the defendant clearly understood his rights at the time he gave his statements.
At trial, the defendant urged the court to allow Dr. Salcedo to testify regarding the diminished mental capacity of the defendant at the time of his statements to the police. Defense counsel argued:
I'm not saying that he had the diminished capacity as far as intent to commit the crime. I'm saying he had the diminished capacity, and he had the mental condition that would make him more susceptible to extensive interrogation, to being able to say things that were suggested to him, instead of things that were true. That is the only issue I wanted Dr. Salcedo to testify to.
In response, the prosecutor argued that diminished mental capacity was not admissible except as to specific intent, that no notice of the witness or diminished mental capacity was given, and that Dr. Salcedo's testimony was not relevant. The trial court ruled refused to allow Dr. Salcedo's testimony. The defendant did not proffer the testimony of Dr. Salcedo.
On appeal, the defendant argues that the trial court erred in not allowing the testimony of Dr. Salcedo regarding the diminished mental capacity of the *826 defendant during his statement to police, and that the defendant was deprived of his constitutional right to present a defense.
At the suppression hearing, the defendant argued that the inculpatory statements were involuntary. At that hearing, defendant had an opportunity to present evidence of the voluntariness of his statements, including diminished mental capacity. The trial court heard testimony and denied the motion to suppress. That ruling is not at issue on appeal.
At trial, the defendant argued that Dr. Salcedo should be allowed to testify that the defendant's statements were involuntary because he had diminished mental capacity. It is clear to this Court that, by urging the trial court to allow the testimony of Dr. Salcedo, the defendant tried to attack the validity of the statements with Dr. Salcedo's testimony and, thus, circumvent the trial court's suppression hearing ruling on the admissibility of his statements.
The trial court has great discretion in rulings concerning the examination of witnesses. State v. Murray, 375 So.2d 80 (La.1979). Further, a trial court's determination as to the admissibility of a statement is within the discretion of the trial court and its decision will not be disturbed unless unsupported by the evidence. State v. Tart, 93-0772, p. 23 (La.2/9/96), 672 So.2d 116, 126, cert. denied, Tart v. Louisiana, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). We again find no merit in defendant's argument.
In his third assignment of error, defendant asks that the record be reviewed for errors patent. Our review of the record according to LSA-C.Cr.P. art. 920 reveals one error patent, which requires remand.
When defendant was sentenced on January 11, 1999, the trial court advised him that he had three years to seek post-conviction relief but failed to indicate when that period commenced. Although the three-year time period was correct at the time defendant was sentenced, LSA-C.Cr.P. art. 930.8 was amended to shorten the prescriptive period to two years, effective August 15, 1999. This amendment has been held to be retroactive. State v. Boles, 99-662 (La.App. 5 Cir. 11/10/99), 750 So.2d 1059, 1062. Therefore, we instruct the district court to send written notice of the two-year prescriptive period to defendant within ten days of the rendering of this Court's opinion and to file written proof into the record that defendant received said notice.
AFFIRMED; REMANDED.
NOTES
[1] On May 29, 1997, Ryan Matthews was also indicted by the Jefferson Parish grand jury for the first degree murder of Tommy Vanhoose. The record reflects that the two defendants were tried separately. See La.C.Cr.P. art. 704.
[2] On January 4, 1999, defendant filed his notice of appeal. He was sentenced on January 11, 1999. The prematurity of defendant's appeal was cured, however, because it was not granted until March 9, 1999.
[3] The victim's son, Rocky, stated that his father usually had a lot of cash at the store because Mr. Vanhoose would cash payroll checks for employees of Avondale Shipyards nearby.
[4] Later, Garabold stated that the gunman was wearing a ski mask and a blue flannel shirt.
[5] At trial, Gloria Falgout identified the ski mask and flannel shirt worn by the perpetrator.
[6] The passenger of the vehicle gave the police a fictitious name of Damien Johnson. He was later identified as Ryan Matthews.
[7] The first taped statement began at 11:45 p.m. on April 5, 1997. The defendant said that he left his house on April 5, 1997 at around 3:30 p.m. to pick up his mother from work. He explained that he dropped his mother off at his sister's house in Terrytown. He claimed that he rode around Marrero and Gretna and later visited some friends named Buzz and Brian. The defendant then said that, around 9:00 p.m., he picked up his brother-in-law and brought him to work at West Jefferson Hospital. After leaving the hospital, he ran into his aunt and her boyfriend who were walking down Ames Street. According to the defendant, he spoke to them about his passenger window not working. The defendant stated that he picked up Damien Johnson who was walking down the street, and that he had only known him for a couple of days. After picking up Johnson, the defendant said they were stopped by the police. Finally, the defendant said that he was the only person in the car since 3:30 p.m. that day.
[8] The second taped statement began at 1:05 a.m. on April 6, 1997. In the second statement, the defendant stated that he picked up his mother from work at 3:30 p.m. and brought her to his sister's house. He then stated that he met with Buzz and Brian around 6:00 or 6:15 p.m. when the sun was going down. According to the defendant, he picked up his mother at 7:00 p.m. from his sister's and brought her home. He explained that he then went joy-riding until 8:45 p.m., when he picked up Damien. The defendant alleged that he and Damien went to pick up his brother-in-law to bring him to work. The defendant said that, after dropping off his brother-in-law, he stopped and talked to his aunt, Barbara Allen, and her boyfriend, Joe, on Ames about the broken passenger window because Joe worked on cars. The defendant again claimed to have only known Damien Johnson for a couple of days.
[9] The third taped statement began at 4:58 a.m. on April 6, 1997. In the third statement, the defendant referred to the passenger as Ryan Matthews. The defendant said that he and Matthews picked up his mother at 3:30 p.m. on April 5, 1997, and brought her to his sister's house. (emphasis added). The defendant contended that, after dropping his mother off, they went joy-riding. The defendant said that Matthews directed him to go to Bridge City to see a girl. According to the defendant, as they approached Bridge City, they stopped at a corner store because Matthews wanted an oatmeal pie and a cold drink. The defendant claimed that Matthews did not have a gun in his hand when he went into the store. The defendant said he later heard gunfire, and that Matthews ran out of the store and told him to drive. According to the defendant, he thought that Matthews was running trying to get out of the store. The defendant and Matthews then went and picked up the defendant's mother at 7:00 p.m.
[10] The fourth taped statement was taken at 5:34 a.m. on April 6, 1997. The defendant admitted that Damien Johnson was Ryan Matthews. He explained that he called him Damien Johnson because that was the name Matthews told the police when they were stopped on April 5, 1997. The defendant said that, on April 5, 1997, they rode around Bridge City for ten minutes and stopped at a corner to buy some blunts (marijuana cigars). He explained that, after smoking the blunts, Matthews got the "munchies" and directed him to stop at a store.