864 So.2d 771 (2003)
STATE of Louisiana
v.
Arvel H. GURGANUS, III.
No. 03-KA-992.
Court of Appeal of Louisiana, Fifth Circuit.
December 30, 2003.
*772 Paul D. Connick, Jr., District Attorney, Thomas J. Butler, Terry M. Boudreaux, William C. Credo, III, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Holli Herrle-Castillo, Marrero, LA, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY, and MARION F. EDWARDS.
THOMAS F. DALEY, Judge.
The defendant, Arvel Gurganus, III, was indicted on charges of second degree murder. *773 Following a trial before a judge, he was found guilty as charged and sentenced to life in prison. He has appealed his conviction. For the following reasons, we affirm.

FACTS
John Alexander testified that, on the afternoon of Saturday, November 25, 2000, he and Rashaan White were working at Rashaan White's barber shop, Divine Creations, on Pollock Street in Kenner. As the two men stood in the shop's doorway conversing, a white van being driven by a white male, entered a parking lot adjacent to the shop.
John Alexander testified that several drug dealers, who were loitering in the area approached the van with the intention of selling narcotics to its occupants. A slim black man exited the van and said, "Mother-f* * * *r, lay it down." The man fired a .9 mm handgun, and a large group of panicked bystanders attempted to get into the shop. Another black man, whom John Alexander recognized as David Williams, exited the van and fired an AK-47 assault rifle. John Alexander concealed himself in some bushes outside the shop. A short time later, John Alexander saw the van leave the scene. The white man was driving, and the slim black man was in the front passenger seat. David Williams was in the back of the van. John Alexander testified that the driver stayed inside the van during the incident and watched. John Alexander was only able to identify the driver as a white male. John Alexander testified that the men acted as if they were committing a robbery.
John Alexander explained that after the van fled, he went inside the shop and saw Rashaan White lying on the floor, with a gunshot wound to his head. John Alexander testified that it looked as if someone had taken items from Rashaan White's person, specifically stating that Rashaan White's wedding ring and some of his money were missing.
Detective Michael Cunningham of the Kenner Police Department testified at trial that he arrived at Divine Creations Barber Shop forty minutes after the shooting. Rashaan White had sustained a bullet wound to the head, and one under his left eye.[1] Approximately thirteen .40 caliber and AK-47 bullet casings were found on the ground outside of the barber shop.
Detective Cunningham testified that witnesses reported that there were three perpetrators. The driver of the van was a white male, and the two gunmen were black males. Detective Cunningham testified that Floyd Bell, who was injured in this incident and other witnesses named David Williams as one of the gunmen.
On the day following the murder, Detective Cunningham interviewed David Williams' family at their residence in Marrero. He learned that defendant, Arvel Gurganus, was the white man involved in the incident. Detective Cunningham obtained arrest warrants for David Williams and defendant, Arvel Gurganus, III.
Detective Cunningham obtained information that the Arvel Gurganus was in Alabama. Arvel Gurganus was arrested in that State. After Arvel Gurganus waived extradition, Detective Cunningham and another officer drove to Bayou Labatre, Alabama, and transported Arvel Gurganus to the police complex in Kenner.
*774 Detective Cunningham testified that when they returned to Kenner, he informed Arvel Gurganus of the charges against him, and advised him that his girlfriend and others had identified him as one of the perpetrators. Arvel Gurganus began to tell the officer about the incident. Detective Cunningham stopped Arvel Gurganus and orally advised him of his rights.[2] Detective Cunningham questioned Arvel Gurganus about the shootings, and Arvel Gurganus gave him an address that Detective Cunningham matched to Darnell Turner. Detective Cunningham showed Arvel Gurganus a photographic lineup, and Arvel Gurganus identified Darnell Turner as the second gunman.
Detective Cunningham again advised Arvel Gurganus of his rights, this time using a Waiver of Rights form. Arvel Gurganus indicated that he understood his rights, that he wished to waive them, and signed a Waiver of Rights form. Arvel Gurganus then gave a tape recorded statement. The taped interview was played at trial, and a transcript of it was admitted in evidence.
During the interview, Arvel Gurganus said he lived at times with his girlfriend, Nina, at the Ridgefield Apartments in Marrero. He explained that he knew David Williams, one of Nina's neighbors. Arvel Gurganus admitted he was with David Williams on November 25, 2000, at the time of the murder. Arvel Gurganus said he stole a van that morning, and picked up David Williams. The two rode around in the van and talked. Arvel Gurganus stated that David Williams told him he needed money, and that he wanted to obtain it by committing a robbery.
Later in the day, the two men then went to a house on Destrehan Avenue, where they located a young man named Marvin. Arvel Gurganus stated that Marvin, was the brother of the second shooter, later identified as Darnell Turner. Arvel Gurganus and David Williams left the house, and returned later in the afternoon. At that time, Darnell Turner exited the house and entered the van. Arvel Gurganus explained that Darnell Turner was walking strangely; that he kept one of his legs straight.
In his statement, Arvel Gurganus stated that David Williams told Darnell Turner about a "lick," or robbery, that he wanted to commit in Kenner. Arvel Gurganus, David Williams, and Darnell Turner departed in the van. Arvel Gurganus told the detective he thought they were simply going to Kenner to meet with someone about committing a robbery. Once in Kenner, the men drove to a Conoco filling station. A barber shop was next to the filling station. David Williams exited the van at the filling station, with the intention of meeting someone. He returned to the van and said the person he was looking for was not there. Arvel Gurganus stated that David Williams told him to drive up and down nearby streets, as he was looking for someone. Arvel Gurganus stated that they eventually returned to the filling station, where the two passengers told him to stop the van. Arvel Gurganus stated that David Williams and Darnell Turner instructed him to park in back of a particular car. There were people inside the car.
Arvel Gurganus stated that he looked at Darnell Turner, who was sitting in the back of the van and saw that Darnell Turner had an assault rifle. Darnell Turner exited the van, and David Williams followed. Arvel Gurganus did not see David Williams in possession of a gun when he left the van. Arvel Gurganus stated that he lay down inside the van and *775 heard a great deal of gunfire, but did not see what was happening.
Arvel Gurganus stated that when the gunfire stopped David Williams and Darnell Turner got back into the van. Arvel Gurganus explained that he noted for the first time that David Williams was carrying a semi-automatic handgun. Arvel Gurganus stated that he drove away from the scene. The van broke down on Interstate 10 and burst into flames. Arvel Gurganus explained that Darnell Turner put the assault rifle near a dumpster next to a convenience store as they continued on foot towards the Galleria office building in Metairie.
Arvel Gurganus explained that the men parted ways after seeing a police officer. Arvel Gurganus watched a movie, then called his father, who drove him home. Arvel Gurganus stated that he told his girlfriend and a friend named Ivan Kellup about the incident. Arvel Gurganus stated that his father drove him to Alabama on Monday, November 27, 2000.

ASSIGNMENT OF ERROR NUMBER ONE
In his First Assignment of Error, Arvel Gurganus contends that the evidence was insufficient to support the conviction. Specifically, Arvel Gurganus argues the State failed to prove he had the requisite knowledge or intent to support his conviction as a principal to second degree murder.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
The State based its case at trial on the theory that Rashaan White was killed during the commission of an armed robbery or attempted armed robbery, and that Arvel Gurganus was a principal to that robbery. Second degree murder is defined by LSA-R.S. 14:30.1(A)(1) as the killing of a human being where the offender is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including armed robbery. One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. State v. Hayes, 01-736, p. 11 (La. App. 5 Cir. 12/26/01), 806 So.2d 816, 823, writ denied, 02-0263 (La.10/25/02), 827 So.2d 1169, reconsideration denied, XXXX-XXXX (La.5/16/03), 843 So.2d 1119. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. LSA-R.S. 14:64. All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid or abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LSA-R.S. 14:24.
Arvel Gurganus contends the State failed to prove that he was involved in the shooting incident to such an extent that he was a principal to the murder. We find that there is a great deal of evidence to the contrary. The inquiry here is whether the State proved that Arvel Gurganus was aware of David Williams' and Darnell Turner's *776 intention to commit a robbery.[3] During his recorded interview, Arvel Gurganus stated that David Williams told him on the morning of November 25, 2000 that he wanted to commit "[s]ome kind of robbery or something" in order to obtain money.
When Arvel Gurganus and David Williams met with Darnell Turner, David Williams said there was someone in Kenner with whom he wanted to meet in order to discuss a robbery. Arvel Gurganus drove the men to Kenner so that they could locate that person. When Detective Cunningham asked Arvel Gurganus whether he thought David Williams was going to commit a robbery, Arvel Gurganus responded, "II thought he was gonna talk to `em about it."
According to Arvel Gurganus, he drove David Williams and Darnell Turner around the neighborhood where the shootings took place stating that he believed David Williams was searching for the person with whom he wanted to discuss committing a robbery. Although Arvel Gurganus denied having seen Darnell Turner's AK-47 until Darnell Turner was preparing to exit the van, the trial judge inferred that Arvel Gurganus could tell Darnell Turner had the rifle hidden in his trousers when he saw him walking straight-legged. When David Williams exited the van along with Darnell Turner, Arvel Gurganus did not attempt to leave the area. Instead, he lay down inside the vehicle when he heard several shots fired. After waiting for Darnell Turner and David Williams to return Arvel Gurganus drove them from the scene. Arvel Gurganus never alerted police rather, he fled to Alabama.
In State v. Hayes, supra, this Court found that the evidence was sufficient to support the defendant's conviction for second degree murder committed in the course of an attempted armed robbery, despite the fact that defendant was not the shooter. This Court noted that the defendant was aware of his co-perpetrator's intention to commit an armed robbery. The defendant admitted to having been at the scene. He waited in a car around the corner from the store where the murder was committed, ready to drive away from the scene after the co-perpetrator jumped in through the passenger window. Moreover, the defendant did not attempt to call police to report the shooting.
Likewise, in State v. Hill, 98-1087 (La. App. 5 Cir. 8/31/99), 742 So.2d 690, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147, this Court affirmed defendant's second degree murder conviction where the victim was killed by the defendant's accomplice during an armed robbery. This Court noted that defendant was at the murder scene, and he knew that his companion planned to rob the victim. He nevertheless chose to remain with the co-perpetrator. Moreover, the defendant did nothing to prevent the crime, or to come to the victim's aid after the shooting. Instead, he fled the scene.
In the present case, at the conclusion of the trial, the trial judge stated:
I believe that it is uncontroverted that Mr. Gurganus was in fact the driver of that vehicle, and I find it inconceivable that after discussing a robbery several times with the other perpetrators, that he could not have known that he was participating in an actual attempted robbery at some point, prior to that event taking place.

*777 I find it further inconceivable that at no time did Mr. Gurganus, prior to these two individuals exiting that vehicle, know that one was armed with an AK 47 assault rifle, and the other sitting next to him, was armed with a .9 millimeter hand gun. After riding around for a period of time, he had to have knowledge that these individuals were armed. Particularly with regard to the AK 47 assault rifle, he testified in hisor he stated in the recorded statement given to Detective Cunningham, that he observed the individual walking funny, as if to imply that this rifle might have been stuffed down the pant leg of that individual.
However, if that did in fact occur, that individual had to have a clip, or a magazine, which is rather large, and would have to have been inserted into that weapon at some point. If that individual was riding in the van, along with Mr. Gurganus and the other individual, either he would have loaded that gun with the magazine, and it would have become very obvious, or, he would have entered the vehicle with the assault rifle in his hands, or carrying it, rather than having been stuffed in an individual's pants, while loaded.
I also find it inconceivable that the individual seated next to Mr. Gurganus, while they are riding around, discussing a robbery, would not have been observed to have been in possession of the.9 millimeter handgun.
We find that there was sufficient evidence for the trial court to conclude that Arvel Gurganus knew his companions were armed and intended to commit a robbery. It is evident from Arvel Gurganus's statement that he was with David Williams and Darnell Turner for several hours prior to the murder and that a robbery was mentioned several times. Furthermore, Arvel Gurganus admitted in his statement that he waited for the co-perpetrators at the scene and helped them to escape. He did not attempt to call police or aid the victim. Instead, he fled to another State. Additionally, the eye witness, John Alexander, repeatedly stated that it was David Williams, whom he recognized, that had the assault rifle, and the other shooter had the handgun. It is reasonable to infer that if Darnell Turner brought the assault rifle into the vehicle, at some point David Williams took possession of the rifle while in the vehicle. It would be inconceivable that Arvel Gurganus was unaware of the transfer of a gun of this size. Based on all of the evidence presented, we find that the State sufficiently proved Arvel Gurganus was a principal to Rashaan White's murder.

ASSIGNMENT OF ERROR NUMBER TWO
In his Second Assignment of Error, Arvel Gurganus argues that the trial court erred in failing to suppress the recorded statement given to Detective Cunningham. Specifically, Arvel Gurganus contends that his statement was not voluntarily made, as he was induced to answer questions by the detective's offer of a seven-year sentence. Arvel Gurganus further argues that the detective made comments designed to elicit information from him before he was advised of his Miranda rights. Arvel Gurganus alleges that Detective Cunningham's credibility was called into question when he testified for the first time at trial that he conducted a "pre-interview" with Arvel Gurganus before he took the recorded statement. Arvel Gurganus argues that Detective Cunningham's credibility was further damaged by discrepancies between the detective's testimony and that of a defense witness.
Before a confession or inculpatory statement can be admitted in evidence, *778 it must be established that the accused who has made the statement under custodial interrogation was first advised of his Miranda rights and that the statement was made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. State v. Thucos, 390 So.2d 1281, 1284 (La.1980).
A determination as to voluntariness is made on a case-by-case basis, with regard to the facts and circumstances of each case. State v. Murray, 00-1380, p. 5 (La.App. 5 Cir. 2/28/01), 782 So.2d 132, 135, writs denied, 01-1026 (La.2/22/02), 810 So.2d 1137, and 01-1854 (La.3/28/02), 812 So.2d 650. The admissibility of a confession or statement is a question for the trial judge, and his conclusions as to the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id. In reviewing the trial court's ruling, the court of appeal may consider evidence presented both at the hearing on the Motion to Suppress and at trial. State v. Fisher, 97-1133, p. 4 (La.9/9/98), 720 So.2d 1179, 1182.
The hearing on Arvel Gurganus's Motion to Suppress Confession was held on January 7, 2003, immediately prior to the bench trial. Detective Michael Cunningham testified that, on December 8, 2000, he and Officer George Hoffman traveled to Bayou Labatre in Alabama, where Arvel Gurganus had already been placed under arrest. Detective Cunningham testified that he asked Arvel Gurganus whether he understood the charges against him, and he responded that he did. Detective Cunningham testified that he did not question Arvel Gurganus about the murder while in Alabama, or during the drive back to Kenner.
Detective Cunningham testified that he advised Arvel Gurganus of his Miranda rights before questioning him after they arrived in Kenner. The detective explained that he reviewed a Waiver of Rights form with Arvel Gurganus and he signed it[4], indicating that he understood his rights and he wished to waive them and give a statement. Detective Cunningham testified that the advisal of rights was not tape recorded. Detective Cunningham explained that prior to beginning the interview, he informed Arvel Gurganus that several people (including relatives of a co-perpetrator, his girlfriend, and his friend, Ivan Kellup) had identified him as having been involved in the murder and then he agreed to give a statement. Detective Cunningham testified that no promises or threats were made to induce Arvel Gurganus to give a statement. Detective Cunningham testified that at no time during the interview did Arvel Gurganus ask him to stop questioning.
Arvel Gurganus testified at the motion hearing that Detective Cunningham and Officer Hoffman spoke to him at length about the murder investigation during the trip from Alabama to Kenner. According to Arvel Gurganus, he was not advised of his rights during that time. Arvel Gurganus testified that Detective Cunningham attempted to induce him to respond to various comments and questions by telling him that if he did not cooperate, he would make sure he received the death penalty.
Arvel Gurganus further testified that once they were at the police station, Detective Cunningham promised him a seven-year sentence if he would cooperate in the *779 investigation. Arvel Gurganus testified that he asked that a lawyer or an Assistant District Attorney be present to verify that such a deal was forthcoming. Arvel Gurganus testified that he signed the Waiver of Rights form voluntarily, and freely agreed to make a statement because he wanted to make it known that he was not the shooter; only the driver.
In his rebuttal testimony at the motion hearing, Detective Cunningham reiterated that nothing was offered to Arvel Gurganus in exchange for his statement, specifically denying any discussion of a seven-year deal. Detective Cunningham denied that Arvel Gurganus asked that an Assistant District Attorney be present during questioning. At the conclusion of the motion hearing, the trial judge ruled that Arvel Gurganus's statement was knowing and voluntary, and denied the Motion to Suppress.
During his trial testimony, on cross-examination, Detective Cunningham recalled that he had questioned Arvel Gurganus and had shown him a photographic line-up prior to the recorded statement; something he had failed to recall until he heard the tape of the interview at the motion hearing. Detective Cunningham explained that he questioned Arvel Gurganus briefly before advising him of his Miranda rights in an attempt to identify the third perpetrator. Detective Cunningham testified that when Arvel Gurganus began to discuss the incident, the detective stopped him and advised him of his rights.
Following Detective Cunningham's trial testimony, defense counsel moved the court to re-open the suppression hearing, arguing that the new information elicited from Detective Cunningham would have made a difference in the judge's ruling. The court agreed to hear additional testimony regarding the Motion to Suppress.[5]
At the re-opened suppression hearing, Arvel Gurganus testified that Detective Cunningham had asked him a number of questions before advising him of his rights. Arvel Gurganus testified that Detective Cunningham told him that his girlfriend gave a statement implicating him in this crime. Arvel Gurganus testified that Detective Cunningham played a portion of his girlfriend's taped statement. Arvel Gurganus further testified that the details about the crime he discussed with Detective Cunningham prior to the advisal of rights were the same as those included in the recorded interview. At the conclusion of the re-opened Motion to Suppress, the trial judge again found the recorded statement was made freely and voluntarily, and that Arvel Gurganus had executed a valid Waiver of Rights. In his second ruling on Arvel Gurganus's motion, the judge said, in part:
I did not find that this [statement] was not voluntary on the part of the defendant, and I am inclined to grant more credibility to Detective Cunningham and his testimony, that he did in fact advise the defendant of his rights, relative to discussing whatever matters they may have discussed prior to the recorded statement being taken.
Arvel Gurganus's argument regarding the trial court's denial of his Motion to Suppress centers on the conflicting testimony of Arvel Gurganus and Detective Cunningham. The trial court's denial of the Motion to Suppress is supported by the record. Detective Cunningham testified that prior to advising Arvel Gurganus of his rights, he told him that several *780 people had implicated him in this crime. Detective Cunningham testified that when Arvel Gurganus began to make statements regarding the crime, he stopped him, orally informed him of his rights, and then proceeded to speak to him about his involvement in the crime. Detective Cunningham repeatedly denied offering Arvel Gurganus anything in return for giving a statement. The trial judge clearly made a credibility determination, stating that he credited the testimony of Detective Cunningham over that of Arvel Gurganus. The credibility of witnesses at a suppression hearing is within the discretion of the trier of fact, who may accept, in whole or in part, the testimony of any witness, and such credibility determinations will not be reweighed on appeal. State v. Calvert, 01-826, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1081, 1084. Given this long standing rule of law, we find that the trial court did not abuse its broad discretion in denying Arvel Gurganus's Motion to Suppress.

ERRORS PATENT DISCUSSION
The record was reviewed for errors patent. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). The review reveals one patent error.
LSA-C.Cr.P. art. 930.8 provides that a defendant has two years from the date "the judgment of conviction and sentence become final" within which to file a post-conviction relief application. At the time of sentencing, the judge simply informed defendant, "[Y]ou have two years to seek post-conviction relief." Based on the transcript, the judge's advisal was incomplete. The commitment indicates, "The Court informed the Defendant he/she has ... two (2) years after judgment of conviction and sentence has become final to seek post-conviction relief." The commitment reflects a proper advisal under Article 930.8. However, where the transcript conflicts with the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
Accordingly, this matter is remanded and the district court is ordered to inform Arvel Gurganus of the provisions of Article 930.8 by sending appropriate written notice to him within ten days of the rendition of the Court's opinion, and to file written proof of such notice in the record. See, State v. Stelly, 98-578, p. 6 (La.App. 5 Cir. 12/16/98), 725 So.2d 562, 564.
For the foregoing reasons, Arvel Gurganus's conviction is affirmed. This matter is remanded for the limited purpose of correctly informing Arvel Gurganus of the time period for seeking post-conviction relief.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] At trial, the parties entered into a stipulation that, if Dr. Glen Rudner were to testify, he would be qualified as an expert in forensic pathology. He would testify that he performed an autopsy on Rashaan White's body, and determined the cause of death to be two penetrating wounds to the right maxilla and right peripheral scalp, with cranial penetration. The doctor named homicide as the cause of death.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] In his brief, Arvel Gurganus does not dispute that a robbery or attempted robbery occurred.
[4] The record shows that the form was introduced in evidence as Defense Exhibit 1. The exhibit is missing from the record, and notes from the district court indicate its whereabouts are unknown.
[5] The judge advised the parties that he would not consider the additional motion hearing testimony as part of the trial evidence.