FREDERICKA HOMBERG WICKER, Judge.
12This is the last in a series of cases to come before this Court involving the murders that occurred on October 30, 2008, at the Gomez Bar. This appeal involves the defendant/appellant, Mr. Pedro Navar-rete-Duran’s (“Navarrete-Duran”), involvement in an armed robbery that ultimately resulted in the deaths of four men. Navarrete-Duran was sentenced to imprisonment at hard labor to three consecutive life sentences after being convicted of three counts of second degree murder. He contends that the evidence was insufficient to support the convictions as a principal to second degree murder. For the reasons that follow, the convictions and sentences are affirmed.
Factual and Procedural Background
Navarrete-Duran relocated from El Salvador sometime between the years of 2000 and 2001 to Katy, Texas and later met Jose Garcia-Cornejo (“Garcia”) in Houston, Texas in August of 2008. The two men, who were both musicians, Leollaborated and played small musical sessions in the Houston area. Navarrete-Duran and Garcia later traveled from Texas to New Orleans in Navarrete-Duraris 2006 Honda Accord to look for work. They arrived in New Orleans on Monday, October 27, 2010, where they met Renil Escobar-Riveria (“Escobar”), for the first time, on Bourbon Street. Navarrete-Du-ran informed Escobar that he and Garcia had no place to live. Escobar then invited the two men to reside with him at his apartment on Orange Blossom — an apartment complex in Jefferson Parish, Louisiana. When the men arrived at Escobar’s apartment on Monday night, they also met the Funes brothers — Rigoberto and Mario — for the first time. Together, these five men would conspire to commit the armed robbery that would occur three days later at the Gomez Bar.
On Wednesday, October 29, 2008, the night before the robbery, Escobar informed the other four men that they would rob the bar where the old men were because a lot of cash was stored there.[1] Es-cobar supplied the weapons for the robbery, arming himself with a .357 magnum, while providing Mario and Rigoberto with a .380 semi-automatic and a .22 handgun, respectively. Navarrete-Duran’s contribution to the crime was the use of his 2006 Honda Accord.
The next day, October 30, 2008, the five men got inside Navarrete-Duran’s car and traveled to Gomez Bar to commit the robbery. Navarrete-Duran was in the driver’s seat; Mario sat next to him in the front passenger’s seat; and Escobar, Garcia and Rigoberto were seated in the rear. Once the men arrived at the bar, Navar-rete-Duran backed into a parking space near the front entrance. The men then *1154 exited the bar and went inside. Escobar and the Funes brothers concealed their weapons. Navarrete-Duran and Garcia were unarmed.
pThe five men played pool and drank beer for approximately twenty minutes. Suddenly, Escobar brandished his weapon and disappeared into a back room while holding a gun to the back of the co-bar owner’s head. Meanwhile, the other four men began robbing the bar patrons — removing contents from their pockets. A shot was fired from the back, and Escobar came running back into the bar yelling “let’s go.” Navarrete-Duran, Garcia, Rigoberto, and Escobar fled from the bar, but Mario remained inside. Mario was behind the bar counter picking up money that had fallen from the cash register. When the other four men got outside, Na-varrete-Duran jumped into the driver’s seat of his vehicle, and Garcia jumped into the front passenger seat. Upon hearing more shots from within the bar, the men realized Mario was still inside. Escobar and Rigoberto returned to the bar with their guns drawn.
Inside the bar, Mario lie wounded on the floor. Wallace Gomez, one of the bar owner’s, was dead on the floor near the pool table. His brother, Beauford Gomez, was also dead on the floor near the bar. Seeing his brother on the floor, presumably dead, Rigoberto immediately opened fire with his .22, firing multiple shots and ultimately killing two other bar patrons. Rigoberto and Escobar then dragged Mario from the bar and headed toward the front door.
Meanwhile, outside of the bar, Mr. Charles Henning was parked next to the Honda Accord, which was occupied by the two Hispanic males. While sitting there, Mr. Henning’s friend opened his truck door and asked whether he heard gunshots. Mr. Henning, however, had not heard anything because his windows were rolled up, and the truck’s engine and air conditioner were running. When Mr. Henning looked up, he noticed that the man in the driver’s seat of the Honda Accord was staring directly at him and appeared to be extremely nervous. He then looked towards the bar and observed three men exiting — one of whom had blood | ^dripping from his head and abdomen. Observing this suspicious behavior, Mr. Henning backed out of the parking lot into an adjacent lot. The Honda Accord, which was parked next to him, had backed into the parking space, which allowed Mr. Hen-ning the opportunity to jot down the front Texas license plate number.
After Rigoberto and Escobar exited the bar with Mario, they observed a police officer driving down the street. Escobar abandoned the two men, jumped in the back seat of Navarrete-Duran’s car and ordered Garcia out to help the Funes brothers. When Garcia exited the car, however, Escobar held a gun to the back of Navarrete-Duran’s head and ordered him to drive away. Navarrete-Duran drove to the Tallowtree Apartments where Brandi Lopez, Escobar’s friend, lived. While there, Navarrete-Duran and Esco-bar drank water from separate wine glasses. Brandi noticed blood on Escobar’s clothing and asked him what was wrong. He explained that he and Navarrete-Du-ran had gotten into a fight down the street. Escobar then went into the bathroom to clean up. Afterwards, Brandi, Escobar, and Navarrete-Duran went outside where they each smoked cigarettes, discarding the butts on the ground.
While outside, Brandi observed a shirt on the ground that she had seen Escobar wear numerous times. When she picked the shirt up, two guns fell out. Escobar picked up the guns off the ground, wrapped them back in the shirt, and took a *1155 towel that was hanging on the outside railing and wrapped it around the shirt. Brandi then told the two men to leave. As they stood there, however, police began to fill the area. Escobar cried and told Brandi that he thought Mario was dead. While Escobar was speaking, Navarrete-Duran continually ordered him to be quiet. The two men eventually fled the scene and hid in a canal until sundown.
|6The police obtained the license-plate number of the 2006 Honda Accord from Mr. Henning and learned that it was registered to Navarrete-Duran. The investigation ultimately led them to the Tallowtree Apartments, where the car had been abandoned. Upon questioning residents in the area, police learned that the occupants of the car had been seen entering apartment 406. The police went to that apartment where Brandi and Donna Lopez — the actual leaseholder — confirmed that the two men had been there. The police then obtained a consent to search the apartment, and seized, inter alia, a wine glass and the three cigarette butts that had been discarded on the ground. Later that evening, the police escorted Mr. Henning to the Tallowtree Apartments, where he identified the 2006 Honda Accord as the same car he had seen at the Gomez Bar earlier that day.
Approximately one week after the murders occurred, Navarrete-Duran was arrested in Houston, Texas. Det. Keith Lo-cascio, the lead detective, along with Det. David Canas, traveled to Houston on November 7, 2008, to interview Navarrete-Duran. Det. Canas, who was fluent in both Spanish and English, accompanied Det. Locascio for the sole purpose of serving as a translator for both Navarrete-Duran and Det. Locascio. When the detectives arrived in Houston, Navarrete-Duran was advised of his Miranda rights in Spanish. He also signed a Spanish Rights of Arrestee form in which he indicated that he understood his rights and wished to waive them.
Navarrete-Duran stated that he and Garcia, whom he had only known for about two months, arrived in New Orleans the Monday before the robbery. He further stated that he did not know Escobar or the Funes brothers before arriving in New Orleans. He stated that Escobar had planned the robbery the night before it occurred and that he was present during that meeting. He admitted driving his car to and from the robbery but stated that he was not armed with a weapon.
|7On February 26, 2009, a grand jury indicted Navarrete-Duran with four counts of second-degree murder in violation of La. R.S. 14:30.1.[2] He pled not guilty at the arraignment and moved to suppress his statement, the evidence seized, and the identification made. All motions were denied. On March 22, 2010, Navarrete-Duran’s motion to declare La. C.Cr.P. art. 782(A) unconstitutional was also denied. However, his motion to quash Count Two of the indictment — La. R.S. 14:30.1 in relation to Beauford Gomez— was granted.[3] Navarrete-Duran was tried by a twelve-person jury for the second degree murders of Wallace Gomez, Wayne Hebert, and Jeffrey Carmadelle. The jury found him guilty on all counts. He was sentenced to life imprisonment at hard labor for each of the three convictions. The sentences were imposed without the *1156 benefit of probation, parole, or suspension of sentence and were ordered to run consecutively.
Discussion
In his sole assignment of error, Navar-rete-Duran contends that the evidence was insufficient to convict him as a principal to second degree murder.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
In this case, Navarrete-Duran was convicted of three counts of second degree murder, a violation of La. R.S. 14:30.1. Second degree murder is the | skilling of a human being when the offender is engaged in the perpetration or attempted perpetration of certain enumerated felonies, included armed robbery. La. R.S. 14:30.1(A)(2). The evidence in this case overwhelmingly indicates that Navar-rete-Duran was not armed with a weapon during the commission of the armed robbery that occurred at the Gomez Bar. However, La. R.S. 14:24 provides:
[A]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Only those persons who knowingly participate in planning or executing a crime are principals to that crime. State v. Cedrington, 98-0253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 573 (citation omitted). Mere presence at the scene of a crime is not enough to make one a principal. Id. Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. Id. at 573-74. However, “[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.” State v. Page, 08-531, p. 10 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, unit denied, 09-2684 (La.6/4/10), 38 So.3d 299.
In State v. Gurganus, 03-0992 (La.App. 5 Cir. 12/30/03), 864 So.2d 771, this Court held that the evidence was sufficient to convict the driver of the get-a-way car with second degree murder. In that case, Gur-ganus drove two of his co-perpetrators, who were armed with weapons, to a filling station where a robbery and murder were committed.[4] Prior to the robbery, one of Gurganus’ co-perpetrators told him that he needed to commit a robbery because he needed some | flcash. Id. at 774. The two then went to pick up the third co-perpetrator. Gurganus drove the two men to a gas station. The two passengers exited the van and opened fire. Gurganus, who remained inside the van, ducked down and waited for the two men to return. Once they returned, Gurganus drove away, abandoned the van, and returned home to Alabama. In that case, we stated:
[I]t is evident from Arvel Gurganus’s statement that he was with David Williams and Darnell Turner for several hours prior to the murder and that a robbery was mentioned several times. *1157 Furthermore, Arvel Gurganus admitted in his statement that he waited for the co-perpetrators at the scene and helped them to escape. He did not attempt to call police or aid the victim. Instead, he fled to another State.
Gurganus, supra, at 777.
Turning to the present case, Na-varrete-Duran learned on Wednesday night that a robbery was going to occur. He was aware that his role in the robbery was to provide transportation to and from the bar. Complying therewith, he then transported the four men, three of which he knew were armed, to the Gomez Bar on October 30, 2008. While inside the bar, he then assisted the other men in ordering the bar patrons to the rear. Once a gunshot was fired, however, Navarrete-Duran ran back to his car and nervously waited for his co-perpetrators to return. He never called the police nor did he attempt to render assistance to anyone who may have been hurt. Instead, he abandoned three of his co-perpetrators at the scene, hid in a canal until sundown, and later fled to Texas.
Viewing the evidence in the light most favorable to the State, this Court finds that the evidence was sufficient to convince a rational trier of fact that Navarrete-Duran aided and abetted in the commission of the armed robbery that resulted in the deaths of the four men. Therefore, this assignment of error is without merit.
ImConcIusion
We have reviewed the record for errors patent in conformity with State v. Oli-veaux, 312 So.2d 337 (La.1975) and have found none. Thus, the convictions and sentences are affirmed.

AFFIRMED

. Gomez Bar was a community bar that also provided check cashing services.

. Garcia, Mario, Rigoberto, and Escobar were also charged in the same indictment for second-degree murder. However, their cases were later severed, and the men were ordered to be tried separately.

. It was determined that Beauford Gomez was killed by a bullet fired from Wallace Gomez’s weapon.

. Gurganus gave a statement to the police in which he stated that he thought he was driving his friends around to speak with someone about committing a robbery. He stated that he did not know the robbery was actually going to be committed.