910 So.2d 956 (2005)
STATE of Louisiana
v.
Birger E. FROILAND.
No. 05-KA-138.
Court of Appeal of Louisiana, Fifth Circuit.
July 26, 2005.
*958 Paul D. Connick, Jr., District Attorney, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Anne Wallis, Assistant District Attorneys (Appellate Counsel), Kia M. Habisreitinger, Martin Belanger, Assistant District Attorneys, (Trial Counsel), Gretna, Louisiana, for Plaintiff/Appellee, The State of Louisiana.
Laura M. Pavy, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant, Birger E. Froiland.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
SUSAN M. CHEHARDY, Judge.
Birger E. Froiland appeals his conviction of theft of goods having a value of $500.00 or more, and his resulting sentence. We affirm the conviction and the sentence, but modify the conditions of probation, and remand for correction of patent errors.
On July 9, 2002, the Jefferson Parish District Attorney filed a bill of information charging that Birger E. Froiland, from July 3, 1998 to January 1, 2002, violated La.R.S. 14:67 by theft of U.S. currency, valued at greater than $1,000.00, belonging to New Orleans Hamburger and Seafood Company.[1] The defendant entered a plea of not guilty.[2]
On December 9, 2003, trial commenced before a six-person jury, which returned a verdict of "guilty of theft of goods having a value of $500 or more."[3] On March 3, 2004, the trial court sentenced the defendant *959 to six-and-one-half years of imprisonment at hard labor, with all but eighteen months suspended, with credit for time served, and to serve five years of active probation upon release. As special conditions of probation, the trial judge ordered the defendant to pay $210,000.00 in restitution to New Orleans Hamburger and Seafood Company and $10,000.00 to Norris Gremillion. The defendant filed a pro se motion for appeal, which the trial court granted on April 4, 2004.[4]

FACTS
New Orleans Hamburger and Seafood Company (hereafter "New Orleans Hamburger") is a restaurant business started by Sander Wiener (hereafter "Sandy") and Norris Gremillion (hereafter "Norris") in 1985. In 1987 they hired Birger Froiland, the defendant, as office manager of the company. The defendant had worked for them in another business and they had known him for years. At New Orleans Hamburger he was responsible for all paperwork, including preparing profit and loss statements and weekly cash flow reports, and he had authority to sign all company checks. In addition, he often signed personal checks for Sandy and Norris.
At trial, Norris described the defendant as a very hardworking, honest, and very capable individual. Sandy said he trusted the defendant with everything he had and thought he was a good employee.
New Orleans Hamburger eventually expanded from one restaurant to three, all located on the East Bank of Jefferson Parish. In 1992, Sander Wiener's son, Gary Wiener (hereafter "Gary"), began working for the company as a manager. In June 1993, Gary purchased part of his father's interest in New Orleans Hamburger. Shortly thereafter, Gary was named president of the company and became responsible for day-to-day operations. In 1994, he was added as an authorized signatory on the company's accounts at Whitney National Bank.
In October 1996, the three owners held a meeting with their accountant, at which Birger Froiland was present. The accountant recommended that the company institute a checks-and-balances system, because the defendant was the only one handling the finances in the office. Accordingly, the partners withdrew the defendant's check-signing authority and made check-signing part of Gary's duties, with Sandy or Norris to sign checks when Gary was not available.
Gary testified that the defendant officially stopped signing checks in October 1996. However, New Orleans Hamburger did not formally remove the defendant's signature from the signature card at the bank until August 31, 1998.
Although the accountant had advised the partners to review the bank statements regularly, Gary admitted they did not do so, because they trusted the defendant. In the year 2000, however, Gary noticed he was no longer receiving profit and loss reports or cash flow reports from the defendant. Gary requested the reports from the defendant and, when he received a group of them at once, Gary discovered *960 they were inaccurate. He told the defendant to redo them accurately.
On March 7, 2002, the defendant presented Gary with a cash flow report indicating the available cash balance in the bank. Gary was stunned to discover the amount was considerably less than he believed was in the bank. Gary told the defendant there must be some mistake in the figures, but the defendant told Gary the cash flow report was accurate.
Gary informed his father of this development, and began an internal investigation by going through the boxes of cancelled checks in the company's storage facility. After comparing the cancelled checks with the bank statements, Gary discovered that four cancelled checks totaling $65,000 were missing.
On March 11, 2002, the three owners went to the bank and obtained copies of the four missing checks. They discovered that the checks were made payable to the defendant, Birger Froiland, and that the defendant had signed Sander Wiener's name without authorization.
The three owners made several unsuccessful attempts to contact the defendant. Gary finally located him in a hospital emergency room, where the defendant apparently was being treated for a stress-related condition. Gary and Norris each spoke separately to the defendant in the hospital. Gary confronted the defendant with the owners' discoveries, but the defendant neither explained nor denied anything. Gary terminated the defendant from employment, and told him they had to contact the police. According to Gary, the defendant looked ashamed and told Gary he would do the same under the circumstances.
Norris asked the defendant whether his actions had anything to do with his father's gambling. The defendant replied that his father gambled a lot; Norris assumed the defendant's actions were related to helping his father with that problem. Norris also asked the defendant how much money was involved, and the defendant told him he did not believe that it was even as much as $65,000.
Norris testified he was very depressed after learning that the defendant had been stealing from him. He had trusted the defendant and he didn't believe this could happen. Norris also testified that the defendant was never authorized to sign Norris's name to any company checks, although he was authorized to sign Norris's personal checks. Norris also said there were a couple of times when the owners wanted to give the defendant raises, but he refused and told them he didn't need a raise.
Sandy testified he never authorized the defendant to sign his name to any New Orleans Hamburger checks or to write checks to himself or to his Discover account. Sandy felt unable to confront the defendant in the hospital on that day because of the hurt, disappointment, and shock he felt at the defendant's actions.
New Orleans Hamburger retained attorney Peter Butler to seek legal redress. On March 15, 2002, Butler wrote to the defendant, stating that he had been retained by New Orleans Hamburger because the defendant had fraudulently signed over $100,000 in company checks. Butler advised the defendant that the matter had been referred to the district attorney's office and he offered the defendant the opportunity to make restitution. At a meeting in Butler's office on April 11, 2002, the defendant admitted he had signed Sandy's name without authority.
The defendant told Butler that after he was replaced by Gary, he decided to give himself a raise because he felt he had more ability than Gary. He also told Butler *961 he had used the money to pay for his father's illness and to pay his own personal bills. The defendant asked for an extension of time to raise money to pay back the missing funds.
On April 16, 2002, however, the defendant telephoned Butler's office and said his family would not give him the money to make restitution. He told Butler that it was his "wrong" and his "burden." According to Butler, the defendant never disputed he had signed the checks and he admitted he had no authority to sign the checks.
Meanwhile, Gary continued going through the company's records, and the dollar amount of unauthorized checks written by the defendant continued to increase. Gary eventually determined that from September 8, 1997 to January 31, 2002, the defendant had written unauthorized company checks to himself in the amount of $216,706.28. The checks either had been deposited in the defendant's personal Whitney bank account, or had been used to pay the defendant's personal credit card bills.
Gary also found some checks signed by the defendant, as well as some unsigned checks, written to legitimate payees such as the Internal Revenue Service and a public utility company. Gary testified these checks had not been included in the estimated amount they believed taken by the defendant, because it was unclear whether he applied those checks for his personal use. Nevertheless, Gary testified, the defendant did not have authority to sign such checks at that time.
In addition, Norris discovered that the defendant had written a check to himself in the amount of $10,000 from Norris's personal bank account.
After the owners contacted authorities, Detective Charles Cassard of the Jefferson Parish Sheriff's Office Economic Crime Unit investigated the complaint. On March 20, 2002, he met with Sandy, Gary, and Norris and they informed him of the discoveries they had made to that date. On March 26, 2002, Detective Cassard contacted the defendant by telephone. The defendant mentioned he needed an attorney and Cassard replied it was the defendant's decision whether he needed an attorney to refute the allegations against him. According to Detective Cassard, the defendant responded, "I did this, why would I say I didn't?" A couple of days later, Norris telephoned Detective Cassard and asked him to halt prosecution of the case because they were attempting to work out a repayment deal with the defendant through the company attorney, Butler.
On April 18, 2002, however, Gary contacted the detective and advised him that negotiations with the defendant had failed and the owners wanted to proceed with the case. On April 29, 2002 the detective obtained an arrest warrant for the defendant. The defendant surrendered to the police on May 2, 2004.
At the time of trial of the criminal charge, a civil suit by New Orleans Hamburger against the defendant was pending.
Birger Froiland testified in his own defense. According to the defendant, when he started with New Orleans Hamburger, he had been told he could reimburse himself for any business expenses. The defendant said he did not start reimbursing himself until 1997, however, because New Orleans Hamburger was not profitable enough before then to do so. He said he wrote the checks at issue as reimbursement for $249,355.00 in expenses incurred over the course of thirteen-and-one-half years of working for New Orleans Hamburger.[5]
*962 The defendant acknowledged that his check-signing authorization was withdrawn, but he maintained he still had authority to write checks.[6] Although he no longer signed any checks in his own name, he signed checks with Sander Wiener's name. He said Sandy's handwriting was easier to reproduce than Norris's and that is why he used it. The defendant said, "I signed Sandy Wiener's name to a lot of checks after they said not to because it was inconvenient for them to come into the office."
He also stated that the company began losing money in 2000, but that he continued writing checks to himself. According to the defendant, after Gary came into New Orleans Hamburger, Gary eventually took away most of his privileges, to the extent that the defendant "practically had to raise [his] hand to make a phone call."
The defendant denied telling Peter Butler he felt he was underpaid, denied telling him he was using the money to pay his father's medical bills, and denied telling Butler he lacked authority to sign the checks. The defendant blamed the whole situation on misunderstandings arising from the relationship between him and Gary, whom he said was a negative influence on Sandy and Norris. He suggested that Sandy and Norris lied in their testimony in order to support Gary's version of events.
In rebuttal, however, Norris, Sandy and Gary testified they never authorized the defendant to reimburse himself for any of the expenses he claimed were authorized. Sandy testified that even if these were reimbursements for expenses, they were unauthorized. Gary testified that if even they had agreed to reimburse the defendant's automobile expenses, the defendant would have charged it to his company credit card, which he and other employees possessed, or he would have turned in a receipt.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment, the defendant claims he was deprived of his constitutional right to present a defense because the trial judge refused to permit him to question Gary about various cancelled checks, which the defendant claims would have proved that New Orleans Hamburger routinely paid the personal expenses of its employees.[7] In addition, the defendant contends the trial judge improperly commented on the evidence when sustaining the State's objection and that the comments warranted a mistrial.
In response, the State asserts that the trial judge's ruling was correct; further, that the defendant was permitted to present a defense because he elicited testimony from Gary regarding New Orleans Hamburger's reimbursements and payments to employees. The State adds that the trial judge did not make an improper comment.
During cross-examination, defense counsel questioned Gary about various payments made to different employees. *963 In particular, Gary testified that the company increased one manager's salary by the amount that would have spent on the manager's medical insurance, because the manager was covered under his wife's policy. The defense also questioned Gary about the general manager's expenses. Gary testified that the general manager's automobile expenses were paid, and that she was provided a cell phone by New Orleans Hamburger, which paid the bill. In addition, when she was out of the office for a while due to an injury, the company paid her salary and she turned in her worker's compensation checks to New Orleans Hamburger in care of the defendant.
In response to the defendant's questions about another employee, an assistant manager, Gary testified that New Orleans Hamburger did not reimburse her medical expenses when she had surgery, but that the company paid her salary while she was out because she was a key employee.
Thereafter, the defense inquired into whether New Orleans Hamburger paid phone bills for its owners and managers. The trial judge overruled the State's objection and the defense then elicited testimony from Gary that New Orleans Hamburger had reimbursed both Sandy and Norris for their home phone lines so that they could stay in touch with New Orleans Hamburger, because they lived on the Northshore. The State objected again on the basis of relevance when the defense asked Gary whether Air Fast, an air conditioning company, had performed any personal repairs for managers or owners of New Orleans Hamburger. At a bench conference, defense counsel stated, "These are bills paid, air conditioning bills paid, some are personal bills paidreimbursed by the Company toI don't now whether it's the owners only or whether it's the owner and the managers. I'm going to find out in a second."
The defendant asserted that inquiring into these bills was relevant to support his defense that New Orleans Hamburger had also reimbursed his personal bills as well. The State responded:
[W]e're not talking about landlines, we're not talking about cell phones, we're talking about over $200,000.00 payable to a Discover card ... and a Whitney Bank. That has no relevance. Now if he's got bills, Birger Froiland has bills paying his landline, his cell phone, whatever, great, bring it. Let's see it, and then we'll get into this. But right now, this has absolutely no relevance. They are correct, these are bills that they paid for different various things. He's not saying that these are bills paying to a Discover card, that these are paid to a personal checking account. This has no relevance at this point.
The trial judge stated "I agree," at which point a juror stated, "Your Honor, if approaching the bench is meant for us not to hear it, it doesn't work." The trial judge responded, "Well, it's one of the limitations we have in the courtroom, unfortunately."
We address first the defendant's claim that the trial court excluded evidence essential to his defense "based upon its apparent misapprehension of relevance."
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to present a defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); accord State v. Calloway, 97-796 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, 567, writs denied 98-2435, 98-2438 (La.1/8/99), 734 So.2d 1229.
All relevant evidence necessary to that defense must be presented for a full *964 adjudication. State v. Vigee, 518 So.2d 501 (La.1988). However, this right does not require a trial court to permit the introduction of evidence that is irrelevant or that has so little probative value it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Carter, 96-358 (La.App. 5 Cir. 11/26/96), 685 So.2d 346, 351.
Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." La.C.E. art. 401. However, a court is not required to allow the defense to introduce evidence, which although relevant, has little probative value and might confuse the jury or cause unnecessary delay. See La.C.E. art. 403; Calloway, supra. The determination concerning relevancy of evidence is within the discretion of the trial judge whose rulings will not be disturbed in the absence of an abuse of discretion. Carter, 685 So.2d at 351.
The testimony the defense sought to elicit from Gary does not appear to be relevant, because the record does not reflect either the amount of any payments or to whom such payments were made. The fact that New Orleans Hamburger may have paid air conditioning bills for unspecified individuals in an uncertain amount does not tend to prove that the defendant's payments to himself and to his personal credit card totaling over $200,000.00 were authorized by New Orleans Hamburger.[8]
Thus, the trial judge did not abuse his discretion in sustaining the State's objection. Further, as pointed out in the State's brief, the defendant was able to present his defense, considering that defense counsel had already questioned Gary extensively on other Company payments and reimbursements to various employees.
The second issue raised in this assignment is whether the trial judge's remark "I agree," following the prosecutor's argument at the bench that the evidence was irrelevant, constituted an impermissible comment on the evidence in violation of La.C.Cr.P. art. 772.
The State points out that the defendant did not object and, in any event, that the judge did not make an impermissible comment.
In State v. Rochon, 98-717 (La.App. 5 Cir. 3/10/99), 733 So.2d 624, 629-630, this Court reviewed comments made by the trial court absent an objection by the defendant. See also State v. Norman, 99-600 (La.App. 5 Cir. 2/16/00), 756 So.2d 525, 529, writ denied 00-971 (La.3/23/01), 787 So.2d 1007. Accordingly, we shall review this claim.
La.C.Cr.P. art. 772 provides, "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted." We have recognized that the statutory prohibition against the judge's commenting on the facts of case is inapplicable to a bench conference, since the comments were not made in front of jury. State v. Hubbard, 97-916 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, writ denied 98-643 (La.8/28/98), 723 So.2d 415.
Hubbard is inapplicable here, however, because although the trial judge's remarks occurred during a bench conference, they *965 were inadvertently overheard by at least one juror.
Nevertheless, the Louisiana Supreme Court has consistently held that the prohibition of Article 772 does not apply to a trial judge's reasons for rulings on objections relating to the admission or exclusion of evidence, provided they are not unfair or prejudicial. State v. Knighton, 436 So.2d 1141, 1148 (La.1983), cert. denied 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). Accord State v. Styles, 96-897 (La.App. 5 Cir. 3/25/97), 692 So.2d 1222, 1231, writ denied 97-1069 (La.10/13/97), 703 So.2d 609.
In State v. Styles, this Court found that the trial judge's remarks while overruling the defendant's objection during closing argument merely explained the ruling and did not constitute a comment on the evidence. Specifically, the defendant objected to the prosecution's rendition of a witness' testimony, and the trial judge overruled the objection, stating, "I believe it's accurate, Mr. Lawrence [defense counsel], I'm going to allow the close to continue." Id. at 1231.[9]
In State v. Knighton, supra, the supreme court held that the trial judge's statement in overruling the defendant's objection to admissibility of the bullet recovered from the victim's body merely explained the judge's ruling and were not unfair or prejudicial. The remarks at issue were as follows:
I believe that the evidence does establish there is sufficient chain to allow it to be admitted in evidence. This is not a proof beyond reasonable doubt type situation, and I believe that the proof is sufficient to allow it to be introduced. So the objection is overruled. Let it be filed in evidence as state exhibit number one. And let the objection
Id. at 1148. The Knighton court found that the judge's remarks did not raise an inference as to defendant's innocence or guilt or imply the judge's opinion regarding a material issue. Id. at 1148-1149.
In this case, we find the trial judge's remarks were not a comment on the evidence. Rather, they indicated his determination that the evidence was irrelevant. The remarks did not raise an inference as to the defendant's innocence or guilt or express or imply the judge's opinion regarding a material issue.
Based on the foregoing, the trial judge did not make an impermissible comment within the meaning of La.C.Cr.P. art. 772. Hence, there is no merit to this assignment.

ASSIGNMENT OF ERROR NUMBER TWO
In the second assignment, the defendant contends his sentence is constitutionally excessive because of the lengthy sentence of imprisonment and because of the "impossibly burdensome restitution." The State responds that the defendant waived his argument on appeal because he did not object to the sentence, that the defendant is limited to a review for constitutional excessiveness because he failed to file a motion to reconsider sentence, and that the trial judge did not abuse his sentencing discretion.
The State is correct insofar as it contends that the defendant is limited to a constitutional review for excessiveness. This Court has recognized that the failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a *966 review of his sentence for constitutional excessiveness only. State v. Hester, 99-426 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied 99-3217 (La.4/20/00), 760 So.2d 342. Thus, we limit our review of the sentence accordingly.
The Eighth Amendment of the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. A sentence is generally considered to be excessive if it is grossly disproportionate to the offense or imposes needless pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Williams, 98-1146 (La.App. 5 Cir. 6/1/99), 738 So.2d 640, 655, writ denied 99-1984 (La.1/7/00), 752 So.2d 176.
The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Watts, 99- 311 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, 64, writ denied 99-2733 (La.3/24/00), 758 So.2d 145.
La.R.S. 14:67 provides penalty for theft valued at $500.00 or more in pertinent part:
B. (1) Whoever commits the crime of theft when the misappropriation or taking amounts to a value of five hundred dollars or more shall be imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than three thousand dollars, or both.
In this case, the record reflects the trial judge sentenced the defendant after considering the pre-sentence investigation report.[10] The judge addressed the defendant in open court and asked where the money had gone. The judge stated that based on the pre-sentence investigation report, the defendant did not live a lavish lifestyle and asked the defendant if he had any of the money left.
The defendant told the trial judge that it was spent on his credit card expenses and interest incurred over the past twelve years and that he was in additional debt for $160,000. Thereafter, the trial court imposed a six-and-one-half year-sentence of imprisonment at hard labor, suspended all but eighteen months, and placed the defendant on active probation for five years following his term of imprisonment. The judge ordered the defendant to pay $210,000 in restitution to New Orleans Hamburger and $10,000 to Norris Gremillion.[11]
While the defendant contends that his sentence of imprisonment was excessive, the six-and-one-half year sentence is in the midrange of the possible ten-year sentencing exposure. Also, the sentence is in line with similarly situated offenders. See State v. Delaneuville, 545 So.2d 659, 663 (La.App. 5 Cir.1989), writ denied 551 So.2d 1335 (La.1989).
The record does not establish whether the defendant had prior convictions. Even assuming the defendant is a first-felony offender, however, the trial judge did not abuse his sentencing discretion in imposing the term of imprisonment. The defendant took advantage of his position as a trusted employee of twenty-seven years to accomplish his crime. Further, the trial court suspended most of the sentence, requiring *967 the defendant to spend only eighteen months in prison, and did not impose a fine. Accordingly, it does not appear that the trial judge abused his discretion in ordering the sentence of imprisonment.
The defendant also asserts that the sentence is excessive because of the "impossibly burdensome restitution." It is noted that the defendant does not dispute the accuracy of amount of the restitution, and does not state any particular reason, other than that it is burdensome, that the restitution renders his sentence constitutionally excessive.
When a court places a defendant on probation, it may impose any specific condition of probation that is reasonably related to rehabilitation, including a requirement that the defendant make "reasonable reparation or restitution to the aggrieved party for damage or loss caused by his offense in an amount to be determined by the court." La.C.Cr.P. art. 895(A)(7). La.C.Cr.P. art. 895.1 provides in pertinent part:
A. (1) When a court places the defendant on probation, it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any direct loss of actual cash, any monetary loss pursuant to damage to or loss of property, or medical expense. The court shall order restitution in a reasonable sum not to exceed the actual pecuniary loss to the victim in an amount certain. However, any additional or other damages sought by the victim and available under the law shall be pursued in an action separate from the establishment of the restitution order as a civil money judgment provided for in Subparagraph (2) of this Paragraph. The restitution payment shall be made, in discretion of the court, either in a lump sum or in monthly installments based on the earning capacity and assets of the defendant.
La.C.Cr.P. art. 895.1(B)(5) further provides that, when the court suspends the imposition or execution of sentence and places the defendant on probation, the court has the discretion to order, as a condition of probation, that the defendant pay an additional amount to compensate the victim for his loss and inconvenience, and this amount "may be in addition to any amounts ordered to be paid by the defendant under Paragraph A herein."[12]
Considering that State's evidence that the defendant wrote over $200,000 in checks without authorization, we find that the trial judge did not abuse his discretion in setting the amount of restitution, subject to the discussion, below, regarding restitution to Norris Gremillion. Accordingly, we conclude that the sentence is not constitutionally excessive.[13]

*968 ERROR PATENT DISCUSSION
We reviewed the record for errors patent, pursuant to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We found several patent errors, but we mention only those that require correction.

1. Failure To Give Accurate Notice Of Post-Conviction Rights
First, there are conflicts between the minute entry and the transcript. The commitment reflects that the trial judge correctly notified the defendant of the period for filing post-conviction relief, while the transcript reflects that the post-conviction relief advice given to the defendant at sentencing was incomplete because the trial judge failed to state when the period would begin to run. In accordance with our usual procedure, we shall remand the case for the district court to inform the defendant of the provisions of La.C.Cr.P. art. 930.8. See State v. George, 99-887 (La.App. 5 Cir. 1/4/00), 751 So.2d 973, 975.

2. Conflict in Listing Value of Theft
An additional conflict between the transcript and the commitment is that the commitment show the value of the theft as "$300+," while the transcript of the jury's verdict and the written verdict show the value as "$500 or more." Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Accordingly, we remand the matter for the trial court to correct the commitment to reflect the correct value of the theft of which the defendant was found guilty.

3. Non-responsive Jury Verdict
A bigger problem is that the jury's verdict could be considered ambiguous or non-responsive. Because the verdict is a part of the pleadings and proceedings, any error therein is reviewable as an error patent. State v. Robinson, 04-964 (La.App. 5 Cir. 2/16/05), 896 So.2d 1115, 1127, citing State v. Vincent, 387 So.2d 1097, 1099 (La.1980) and State v. Knight, 526 So.2d 452, 453 (La.App. 5 Cir.1988).
The defendant was charged with theft under La.R.S. 14:67, as opposed to the theft of goods under La.R.S. 14:69.10yet the jury's verdict was guilty of theft of goods having a value of $500.00 or more.
The trial judge's definition of the offense in the jury instructions tracked the definition of the offense as provided in La.R.S. 14:67(A). However, the trial judge also referred to the offense as theft of goods in the jury instructions. Further, the verdict sheet listing responsive verdicts also used theft of goods, as follows:
1. Guilty of theft of goods having a value of $500.00 or more;
2. Guilty of theft of goods having a value of more than $100.00 but less than $500.00;
3. Guilty of theft of goods having a value of less than $100.00;
4. Guilty of attempted theft of goods having a value of $500.00 or more;
5. Guilty of attempted theft of goods having a value of more than $100.00 but less than $500.00;
6. Guilty of attempted theft of goods having a value of less than $100.00;
7. Guilty of unauthorized use of a movable having a value of $1,000 or less
8. Guilty of unauthorized use of a movable in excess of $1,000.00
9. Not guilty.
On the other hand, there was no objection to the verdict. After the foreman stated that the verdict was guilty of theft of goods valued at $500.00 or more, the *969 prosecutor stated, "That should be theft of U.S. currency, not theft of goods under Revised Statute 14:67, not 67.10. Just make a clarification for the record." Thereafter, both defense counsel and the prosecutor told the judge that they had no problems with the verdict and defense counsel requested that the judge poll the jury. The judge then asked the jury to indicate in writing whether they had voted for "theft of goods having a value of $500.00 or more." The written poll reflected that all six had returned this verdict.
La.C.Cr.P. art. 813 provides:
If the court finds that the verdict is incorrect in form or is not responsive to the indictment, it shall refuse to receive it, and shall remand the jury with the necessary oral instructions. In such a case the court shall read the verdict, and record the reasons for refusal.
Thus, it appears that the theft-of-goods verdict resulted from the verdict sheet provided to the jury and the trial court should not have accepted this verdict. We must determine whether reversible error occurred.
La.C.Cr.P. art. 814 lists responsive verdicts for particular crimes as follows:
A. The only responsive verdicts which may be rendered when the indictment charges the following offenses are:
* * *
26. Theft:
Guilty of theft of property having a value of five hundred dollars or more.
Guilty of theft of property having a value of three hundred dollars or more, but less than five hundred dollars.
Guilty of theft of property having a value of less than three hundred dollars.
Guilty of attempted theft of property having a value of five hundred dollars or more.
Guilty of attempted theft of property having a value of three hundred dollars or more, but less than five hundred dollars.
Guilty of attempted theft of property having a value of less than three hundred dollars.
Guilty of unauthorized use of movables having a value in excess of one thousand dollars, but only if a value in excess of one thousand dollars is stated in the indictment.
Guilty of unauthorized use of movables having a value of one thousand dollars or less.
Not guilty.
According to La.C.Cr.P. art. 810, "[t]here shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury." When a verdict is ambiguous, the intent of the jury can be determined by reference to the pleadings, the evidence, the admissions of the parties, the instructions, and the forms of the verdicts submitted. Robinson, 896 So.2d at 1128.
In State v. Vincent, supra, the supreme court reversed a conviction when the jury's verdict convicted the defendant of a crime that was not responsive to the charged offense. The bill of information charged the defendant with receiving stolen property valued at $150. Jury instructions and the list of verdicts included "possession of stolen property," which is not a crime in Louisiana, and the jury found the defendant "guilty of possession of stolen property *970 in the amount of $100." 387 So.2d at 1099. The court considered that the trial judge did not read the specific statute to the jury, instruct the jury of the elements of the offense, or provide a correct list of responsive verdicts. The supreme court reversed the conviction on error patent review, holding that the verdict did not clearly convey the jury's intent to find the defendant guilty as charged or guilty of a lesser included grade of the offense. 387 So.2d at 1100.
In State v. Thibodeaux, 380 So.2d 59 (La.1980), the supreme court reversed a defendant's conviction and remanded for a new trial after an error patent review revealed a non-responsive verdict. The bill of information charged the defendant with distribution of a controlled dangerous substance, but the jury returned a verdict of guilty of possession with intent to distribute a controlled dangerous substance. The jury instructions and responsive verdicts listed the crime charged, but improperly included as responsive verdicts possession with intent to distribute a controlled dangerous substance and attempted possession with intent to distribute a controlled dangerous substance. The supreme court found, that although the non-responsive verdict was induced by erroneous instructions to which there had been no objection, the verdict should have been refused by the trial court. Specifically, the court found that the addition of words "with intent to distribute" to crime of possession of controlled dangerous substance did not simply qualify the verdict under La.C.Cr.P. art. 817, but rather transformed it into a verdict of guilty of another statutory offense which was not responsive to charged offense.[14] 380 So.2d at 61.
In contrast, in State v. Duke, 625 So.2d 325 (La.App. 3 Cir.1993), writ denied 629 So.2d 1183 (La.1993), the court noted an irregularity in the verdict on error patent review, but affirmed the conviction. The bill of information charged the defendant with aggravated oral sexual battery. The verdict sheet misstated the charge as "indecent behavior with a juvenile" and listed the responsive verdicts as guilty, guilty of attempted aggravated oral sexual battery, guilty of oral sexual battery, guilty of attempted oral sexual battery, and not guilty. The jury returned a verdict of "guilty." 625 So.2d at 327. Thereafter, the jury was polled without specific mention of the crime charged and there were no objections to the verdict. Id.
The Duke court distinguished Vincent and Thibodeaux, on the basis that the judge read the specific statute to the jury and furnished the jury with a list of the appropriate responsive verdicts and because the jury was well aware of the elements of the crime charged. The court found that the jury clearly intended to find the defendant guilty of the charged offense rather than the incorrect offense stated on the verdict sheet based on the fact that the bill of information was read to the jury and the crime charged was stated numerous times during trial. 625 So.2d at 327-329.
Absent contemporaneous objection, a jury may return a legislatively-provided responsive verdict, whether or not the evidence supports the verdict, as long as the evidence is sufficient to support conviction for the charged offense. State v. Myers, 584 So.2d 242 (La.App. 5 Cir. 1991), writ denied 588 So.2d 105 (La.1991), *971 cert. denied 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992).
Here, the record reflects that the trial judge correctly instructed the jury on the definition of theft under La.R.S. 14:67. However, the trial judge also instructed the jury on inferring specific intent, using statutory language from La.R.S. 14:67.10 that is not in La.R.S. 14:67:
Specific intent to deprive permanently may be inferred when a person intentionally conceals on his person or otherwise anything of value which belongs to another, alters or transfers anything of value which belongs to another, transfers anything of value which belongs to another from one contained or package to another or places said items of value in any container, package or wrapping in a manner to avoid detection, willfully or willingly cause the cash register or other sales recording device to reflect less than the actual amount, removes any price marking with the intent to deceive the merchant as to the actual retail price of the goods or damages or consumes goods or property so as to render it unmerchantable.[15]
We conclude the jury's verdict reflects an intent to find the defendant guilty of theft under the charged statute, La.R.S. 14:67, not theft of goods under La.R.S. 14:67.10. Specifically, at the very beginning of trial the jury was informed that the defendant was charged with theft, not theft of goods, by the clerk's reading of the bill of information, during the trial judge's preliminary instructions, and in the prosecution's opening statement. In fact, the first mention of the offense as theft of goods occurred in the State's rebuttal, where the prosecutor mentioned that the defendant was charged with theft of goods valued at over $500.00.
Considering the numerous times that the offense was referred to as theft, as opposed to theft of goods, we find that the verdict reflects the jury's intent to find the defendant guilty of theft, not theft of goods under La.R.S. 14:67.10. See State v. Duke, supra.
Further, we find that the words "of goods" had no effect on the verdict, as provided in La.C.Cr.P. art. 817. Compare State v. Thibodeaux, supra.

4. Illegal Condition of Probation
We find, further, that the trial court imposed an illegal condition of probation by requiring payment of restitution to *972 Norris Gremillion personally in the amount of $10,000. In State v. Labure, 427 So.2d 855, 856 (La.1983), our supreme court held it was patently erroneous to impose a condition of restitution to a victim of a burglary for which the defendant had not pleaded guilty, because that person was not an "aggrieved party" or a "victim," as provided by La.C.Cr.P. art. 895.1(A) or La. C.Cr.P. art. 895(A)(7), in connection with the offense to which the defendant pleaded guilty.
In Labure, although the defendant's charge of burglarizing a house was dropped, the trial judge ordered the defendant to pay restitution to the residents of that house as a condition of probation for a sentence on an unrelated burglary. The supreme court held that the defendant could not be ordered to pay restitution to victims of an offense for which he had not been convicted. The concurring opinion in Labure specifically noted that the decision did not necessarily hold that restitution for losses caused by other crimes could never be an appropriate condition of probation. 427 So.2d at 857.
In State v. Alleman, 439 So.2d 418, the supreme court held that restitution could not be ordered to victims of obscene phone calls of which the defendant had not been convicted, as a condition of probation for the defendant after conviction on other charges of obscene phone calls. Accord State v. Elkins, 489 So.2d 232 (La.1986). In Elkins and Labure, the supreme court focused on the fact that the defendant had not pleaded to or been convicted of the crimes for which restitution had been ordered, as well as the fact that there was no evidence linking the defendant to the other crimes.
In the present case, there is evidence that the defendant wrote a $10,000 check from Norris's personal account without authorization. In fact, that check was admitted into evidence without objection. Norris testified that, although the defendant had authority to sign personal checks from his personal account, the defendant did not have authority to sign this check, which was made out to the defendant. While Detective Cassard testified that this check was not included in the chart of listed checks from New Orleans Hamburger and that it was part of a separate case, there is no evidence that the defendant was convicted of or pleaded guilty to charges involving the $10,000 check from Norris.
Therefore, we find this condition of probation is illegal and should be deleted, as in Labure.

DECREE
Accordingly, the defendant's conviction and sentence are affirmed, except that the conditions of probation involving restitution are modified to delete the requirement that the defendant make restitution to Norris Gremillion. We remand and instruct the trial court to correct the commitment to reflect the correct value of the theft of which the defendant was found guilty. In addition, on remand the district court is instructed to inform the defendant of the provisions of La.C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this Court's opinion and to file written proof that the defendant received the notice in the record.
CONVICTION AND SENTENCE AFFIRMED; CONDITIONS OF PROBATION MODIFIED; REMANDED.
NOTES
[1] Originally the bill of information alleged that the theft occurred on or about July 3, 1998, but the bill was amended on November 17, 2003 to extend the period to January 1, 2002. La.R.S. 14:67 was amended by Acts 1999, No. 1251, § 1 to change the grade of penalty from a theft of less than $100 to less than $300 for a misdemeanor, and from a theft of between $100 and $500 to between $300 and $500 for a felony, and from a fine of $1,000 to $2,000 for two or more prior convictions.
[2] The defendant executed a written waiver of his presence at arraignment and appeared in absentia through his attorney.
[3] We discuss the inconsistency between the language in the verdict and the language in the bill of information in the Error Patent section infra.
[4] The filing date on the motion for appeal is illegible. However, information from the district court indicates that the date stamped on the motion is "March 32, 2004," unspecified motions were filed on April 1, 2004, and the case was sent to the Appeals division on April 6, 2004. These facts suggest the appeal was filed within 30 days of the March 3, 2004 sentencing. In any event, the appeal would be timely under the "mailbox rule" for pro se appeals, set out in Houston v. Lack, 487 U.S. 266, 276, 276, 108 S.Ct. 2379, 2385, 101 L.Ed.2d 245 (1988). State ex rel. Egana v. State, 00-2351 (La.9/22/00), 771 So.2d 638.
[5] The defendant also called two former employees: Mark Guidry, who performed maintenance, and Gerrie Guidry, who was the office clerk. Both these employees left New Orleans Hamburger prior to the events underlying the substance of the instant matter. Gerrie Guidry left in 1992, and Mark Guidry left in 1995.
[6] The defendant first testified the owners verbally withdrew his check-signing authority in December of 1997, but subsequently admitted the authorization was removed in 1996, as Sandy had testified.
[7] As mentioned below, the discussion at trial concerned payment of bills, not cancelled checks.
[8] Defense witness Mark Guidry testified New Orleans Hamburger did not pay his personal credit card bills and Gerrie Guidry testified she did not recall being reimbursed for any expenses during her employment.
[9] After finding that the comment was not impermissible, we also stated that the defendant had waived his right to argue the issue on appeal because he did not object at trial. Id. at 1232.
[10] The pre-sentence investigation report was not introduced into evidence at sentencing and is not part of the appellate record.
[11] The State's brief asserts the total amount of restitution was $230,000.00 rather than $220,000.00.
[12] We note the Legislature enacted La.C.Cr.P. art. 883.2, which mandates the trial court to order the defendant to make restitution to the victim as a part of any sentence when the court finds an actual pecuniary loss to a victim, or when costs have been incurred by the victim in connection with a criminal prosecution. See Acts 1999, No. 783, § 3 and Acts 1999, No. 988, § 1. This statute has been held to apply prospectively only. See State v. Miller, 99-950 (La.App. 3 Cir. 2/2/00), 757 So.2d 744, 748. The trial judge specified that the restitution in this case was a special condition of probation, and did not mention that the restitution was part of the sentence pursuant to La.C.Cr.P. art. 883.2.
[13] The amount of restitution not only includes checks the defendant wrote outside the scope of the period charged in the bill of information (July 3, 1998 to January 1, 2002). It also includes restitution to Norris Gremillion, although Birger Froiland was not charged with theft from Gremillion in this bill of information. However, the defendant has not raised those issues and they are not before us.
[14] La.C.Cr.P. art. 817 provides that "[a]ny qualification of or addition to a verdict of guilty, beyond a specification of the offense as to which the verdict is found, is without effect upon the finding."
[15] La.R.S. 14:67 defines "theft" as follows:

A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
La.R.S. 14:67.10 defines theft of goods as follows:
A. Theft of goods is the misappropriation or taking of anything of value which is held for sale by a merchant, either without the consent of the merchant to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the merchant permanently of whatever may be the subject of the misappropriation or taking is essential and may be inferred when a person:
(1) Intentionally conceals, on his person or otherwise, goods held for sale.
(2) Alters or transfers any price marking reflecting the actual retail price of the goods.
(3) Transfers goods from one container or package to another or places goods in any container, package, or wrapping in a manner to avoid detection.
(4) Willfully causes the cash register or other sales recording device to reflect less than the actual retail price of the goods.
(5) Removes any price marking with the intent to deceive the merchant as to the actual retail price of the goods.
(6) Damages or consumes goods or property so as to render it unmerchantable.
(Emphasis added).